# United States Court of Appeals
## For the First Circuit

No. 13-2346

RICHARD NUNES; CARL COE; JOHN DOE; PETER POE; RICHARD ROE, on
behalf of themselves and others similarly situated,

Plaintiffs, Appellants,

v.

MASSACHUSETTS DEPARTMENT OF CORRECTION;
THOMAS GROBLEWSKI; MARK WAITKEVICH,

Defendants, Appellees,

UMASS CORRECTIONAL HEALTH; LEONARD MCGUIRE;
WARREN FERGUSON; JUDITH STEINBERG,

Defendants.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Rya W. Zobel, U.S. District Judge.]

———————————

Before
Kayatta, Baldock,[*] and Selya,
Circuit Judges.

———————————

Joel H. Thompson, with whom Tatum A. Pritchard and
Prisoners' Legal Services were on brief, for appellants.
Tory A. Weigand, with whom James A. Bello and Morrison
Mahoney LLP were on brief, for appellee Thomas Groblewski.
Nancy Ankers White, Special Assistant Attorney General,
and Sheryl F. Grant on brief for appellees Massachusetts Department
of Corrections and Mark Waitkevich.

———————————

September 12, 2014

———————————

———————————

[*] Of the Tenth Circuit, sitting by designation.

**KAYATTA, Circuit Judge**.  Massachusetts prisons provide inmates with semi-monthly or monthly supplies of some medications, which the prisoners then store in their cells and take on their own.  Other medications are dispensed in single doses to prisoners, to be ingested at the dispensing window.  Five prisoners with HIV challenge the decision of prison officials to dispense HIV medication only in single doses at the dispensing window.  The plaintiffs claim violations of the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act.  We affirm the district court's grant of summary judgment against the plaintiffs on each of their claims.

## I. Background

Because the district court granted summary judgment, we "describe the facts giving rise to this lawsuit in a light as favorable to [the plaintiffs] as the record will reasonably allow." Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 145 (1st Cir. 2013).

The plaintiffs in this case are inmates in the Massachusetts state prison system who suffer from HIV.  They sue, among others, the Massachusetts Department of Corrections, which administers the state's prisons.  Because it makes no difference to our analysis, we refer to the department as if it were the sole

defendant and the sole entity responsible for the state's acts at issue here.

This case arose when the department changed the manner by which inmates receive medication for HIV. Prior to the change, many inmates could receive their HIV medication through the "Keep on Person" program, which we will refer to as the "KOP program." When receiving medication through the program, inmates pick up packages of medicine once or twice a month, then store the medicine in their cells and take it on their own initiative. [App. at 66.] In contrast, HIV medication is now available only through the "daily med line," where inmates report for each dose to a dispensing window, then ingest the medication at the window while prison staff observe. [App. at 65.] Both the daily med line and the KOP program are common ways for inmates to receive medications in Massachusetts prisons, depending on what medication they are receiving and whether they satisfy various eligibility requirements.

**A. The Department's Decision to Remove HIV Medication from the Program**

The department first announced its decision to remove HIV medication from the program in August 2008 and implemented the change in February 2009. [App. at 77, 83-84.] The parties agree that the department's primary aim in initiating the change in dispensing practices for HIV medication was to save money. Medication for HIV is expensive, occupying more than 40 percent of

the department's pharmacy budget, although fewer than 3 percent of the prisoners have HIV. [App. at 266.] Faced with budget cuts in 2008, the department examined its expenses and determined that some of the cost of HIV medications arose from "wasted" medication: medication that was dispensed to an inmate through the KOP program, but not used by that inmate while in prison. [App. at 269-271.] Such medication cannot be reused because it has left the hands of licensed medical staff. [App. at 270.] Medication scheduled to be dispensed through the daily med line, however, can be reused if not picked up by the patient. [App. at 270-71.] The department therefore concluded that it could reduce waste and save money by distributing all HIV medication through the daily med line. [ App. at 271.]

The parties agree that there are several sources of wasted HIV medication, but disagree on their relative importance, and on whether the department chose the best approach to mitigate waste. Waste can arise when a prisoner simply chooses not to take medication that he has received through the KOP program. [App. at 73.] It can also arise when an inmate is given too much medication when he picks up his refills. [App. at 275-76.] In addition, waste can result when an inmate is released from prison, is transferred

-4-

within the system, dies, or has his treatment regimen changed.[1] [App. at 73, 274-76.]

When the department announced the change in August 2008, it received complaints from medical staffers concerned about the effect on inmates with HIV. Two doctors who treated inmates with HIV, David Stone and James Quirk, objected to the change and have continued to oppose it. Their chief concern has been that some inmates will be unwilling or unable to take their medication consistently due to the time and effort required to wait at the dispensing window, which some inmates would have to do more than once per day. [App. at 281-83, 97.] The parties agree that it is very important for HIV patients to be "adherent" (or "compliant"), meaning that they take their medication consistently as prescribed. When a patient misses doses, the virus can develop resistance to the medication, for which there will be few alternatives. [See, e.g., App. at 255.] Stone and Quirk also worried that the change would exacerbate the side effects of HIV medication, as inmates would have less flexibility in timing their doses to coincide with meals or sleep. [See, e.g., App. at 1408-09.]

As a result of these complaints, the department initially put the change on hold to study its potential impacts. The department then reviewed data indicating that 93 percent of HIV-

_____

[1] The record does not illuminate exactly why waste can arise in each of these scenarios, but the parties agree that such waste occurs. [App. at 73.]

-5-

positive inmates already reported to the daily med line for other medications. The department also considered data indicating that 44 percent of inmates with HIV requested refills of their HIV medication late or not at all under the KOP program. Given the procedural posture of the case, we do not assume that this particular data was accurate. Rather, because the plaintiffs do not cite any evidence to the contrary, we assume that the department believed the data to be accurate as a product of a sincere effort to gauge the effects of the policy change. After reviewing this information, the department decided to adopt the change.

## B. The Effects of the Policy Change

Since the new policy was implemented, the department has monitored its effects. It has collected data showing that patient outcomes have held steady or improved since the change. The plaintiffs do not dispute the raw numbers collected by the department, though the parties differ on their significance.

A common measure of health for HIV patients is "viral load." Doctors aim to achieve an "undetectable viral load," meaning that the patient has such a low level of HIV in his blood that standard tests cannot detect it. In the last reporting period before the policy change, 83 percent of inmates with HIV had undetectable viral loads. That rate rose to 87 percent immediately after the change and has been documented most recently at

95 percent. While accepting this data as accurate, the plaintiffs contend that it cannot be used to establish that the policy has actually improved health outcomes because the improvement in the first six months of the new policy was not large enough to be statistically significant and the eventual larger improvement may be the product of other factors. [App. at 365-66.]

The department has also monitored late refills as a measure of nonadherence.[2] Late refills have remained more or less steady since before the policy change, starting at 30 percent in December 2008, and fluctuating between 25 percent and 35 percent (with one outlier month at 39 percent) after the change. [App. at 2020, 2036.] The plaintiffs accept these figures as accurate, and admit that late refills are a "proxy" that "potentially reflect nonadherence." [App. at 306-07.] They nevertheless argue that current adherence falls below acceptable standards, without offering any evidence that returning HIV medication to the KOP program would increase adherence.[3] [App. at 364-65.]

_____

[2] Medications, whether delivered through the daily med line or the KOP program, are ordered from a pharmacy on behalf of each inmate receiving them. When an inmate's supply is close to running out, the prison orders a refill on behalf of that patient. The prison can then track the rate at which these refill requests occur behind schedule. [App. at 305-06.]

[3] As a matter of logic, an examination of late refills would seem more prone to overstate adherence for medication provided through the KOP program, where prisoners could return for more medication even without finishing their last pack, than for medication provided through the daily med line, where prison staff observe all doses.

The plaintiffs offer no alternative quantitative metric for assessing the health of inmates with HIV, for determining their adherence, or for otherwise gauging the effects of the policy change. In sum, the undisputed data that exists provides credible support for the department to conclude that the dispensing policy contributed to a material improvement in the health of HIV prisoners as a group, and provides no basis to claim that the change worsened the health of that group of prisoners. It is also undisputed that the change led to significant cost savings. [App. at 293, 317-319.]

## C. The Plaintiffs' Situations

The plaintiffs present relatively little evidence regarding their own situations, focusing instead on the broader population of prisoners with HIV. No medical professional or expert testified specifically about any plaintiff's situation. In describing the consequences of the policy change for the plaintiffs, we can therefore refer only to the plaintiffs' own testimony, along with written complaints they submitted to the prison.

Plaintiff Richard Nunes has not taken any HIV medication since the change, contending that he cannot wait on the daily med line. He cites a painful lower back condition that makes it difficult for him to move or stand, chronic diarrhea, and other sicknesses. [App. at 2351.] Nunes requested as an accommodation

-8-

of his condition that his medication be reinstated to the program. The department instead offered several alternative accommodations: it would provide Nunes with a rolling walker, and allow him to use bathroom facilities and sit on a bench while waiting on line without losing his place. Alternatively, taking his claims regarding the severity of his condition at face value, the department offered to admit him to the medical unit to receive medication for as long as he is too ill to go to the dispensing window. [App. at 2224-26.] Nunes has not accepted these accommodations, and now maintains that he will not attend the daily med line no matter what the department does to accommodate him. [App. at 113.]

The other four plaintiffs have attended the daily med line consistently since the policy change. Three have complained that, in the course of attending the line, their HIV status has been disclosed to other inmates. [App. at 2457, 2487, 2510.] These complaints involve inadvertent disclosures by medical staff, occurring sporadically, and sometimes unconnected to the department's policy change. For example, the plaintiffs complain about a poster in the medical unit identifying HIV medications, but they admit that the poster has since been taken down. [App. at 140.]

Plaintiff Carl Coe has also complained about side effects arising from not being able to take medication before bed. [App. at

2405.] His treatment regimen has since been changed, in part to limit side effects. [App. at 1029, 2405.] Plaintiff John Doe has complained about having to wait in line for a long time and having his medication unavailable there on two consecutive days, while plaintiff Peter Poe has complained that on one occasion he was told to leave the med line and return later. [App. at 131, 2501.] The record does not demonstrate that the plaintiffs experienced such incidents any more than a handful of times in the four and a half years between the policy change and the district court's decision. Nor, with the possible exception of Nunes, does any plaintiff offer competent evidence that his viral loads or health worsened materially during that period.

## D. Procedural History

The plaintiffs initiated this case in November 2010, seeking to enjoin the policy change and restore HIV medications to the KOP program. They do not seek damages. Two years later, after discovery, the defendants moved for summary judgment. The district court granted the motion, and the plaintiffs appealed.

## II. Standard of Review

We consider de novo the question whether summary judgment is appropriate, training our attention not on the district court's opinion, but rather on whether the record entitles the moving party--here the defendants--to judgment as a matter of law. Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).

-10-

See also <u>Travers</u> v. <u>Flight Servs. & Sys., Inc.</u>, 737 F.3d 144, 145 (1st Cir. 2013). Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Generally speaking, a party cannot raise a genuine dispute merely "by relying on the hope that the jury will not trust the credibility of the witness," but must instead present "some affirmative evidence" on the point, except perhaps where the testimony is "inherently unbelievable." <u>McGrath</u> v. <u>Tavares</u>, 757 F.3d 20, 28 n.13 (1st Cir. 2014).

## III. Analysis

### A. The Eighth Amendment

The plaintiffs claim that the change in the method of dispensing HIV medications violated their right to be free of "cruel and unusual punishment[]" under the Eighth Amendment. To prove an Eighth Amendment violation, the plaintiffs must first show that they faced an "objectively intolerable" risk of harm resulting from the department's decision to make HIV medications available only through the daily med line. <u>Lakin</u> v. <u>Barnhart</u>, 2014 WL 3036303 (1st Cir. July 7, 2014) (quoting <u>Farmer</u> v. <u>Brennan</u>, 511 U.S. 825, 846 (1994)). In cases based on a prisoner's medical treatment, a prisoner must show that the medical care provided is not "adequate," as measured against "prudent professional standards." <u>United States</u> v. <u>DeCologero</u>, 821 F.2d 39, 43 (1st Cir.

1987); see also Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011).

A plaintiff must then show that state officials "kn[ew] of and disregard[ed]" the risk of harm. Farmer, 511 U.S. at 837. To satisfy this "deliberate indifference" requirement, a plaintiff must show that state officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . dr[ew] the inference." Id.

The plaintiffs' evidence would not allow a reasonable jury to find that they had satisfied either requirement. As to the objective requirement, the plaintiffs rely primarily on the testimony of Stone and Quirk, the two doctors who work in the prison system, and on the affidavit of an outside expert, Dr. David Bangsberg. Yet, none of these witnesses testified specifically about the plaintiffs' situations. Bangsberg did not examine the plaintiffs, review their medical records, or offer any analysis of their particular situations. [App. at 362-66.] Indeed, he did not conclude that the department had provided inadequate medical care to any inmate, although he identified, in the abstract, certain practices as "substandard." [App. at 362, 366.] Meanwhile, the testimony of Stone and Quirk establishes, at best, that certain inmates--not identified as any of the plaintiffs--have suffered problems resulting from the policy change, but the testimony does

-12-

not attempt to measure these problems against medical standards. [See, e.g., App. at 1420, 1455.]

Even viewed in the light most favorable to the plaintiffs, none of this testimony establishes that any plaintiff has actually received medical care falling below professional standards. Nor does the remaining evidence make possible such a finding. The plaintiffs present their own written complaints, but these complaints are unaccompanied by medical analysis and document only occasional medical problems arising from the policy change: temporary side effects for one plaintiff, and a handful of missed doses for two others.[4] As to the statistics presented by the parties, they further undermine the plaintiffs' case: on the whole, more patients have undetectable viral loads since the change, and late refills have remained steady. Even fully accepting the plaintiffs' criticisms of the data, one would be bound to conclude that the policy change did not make outcomes any worse, even if it did not make them any better.

The plaintiffs' problems only multiply on the issue of deliberate indifference. As demonstrated above, the record is so devoid of evidence of actual medical risk to the plaintiffs as to make it unreasonable to conclude that the department knowingly

---

[4] Although another plaintiff, Nunes, has not taken his medication since the policy change, we explain below in part C that the prison has made reasonable efforts to accommodate the problems that he says prevent him from doing so.

-13-

disregarded such a risk. Even if the plaintiffs' evidence raised a possibility of harm to the group of HIV-positive prisoners as a whole, that possibility is so uncertain and unsupported by before-and-after evidence as to preclude a reasonable factfinder from inferring that the department is now knowingly disregarding a harm to these prisoners. On the contrary, the undisputed facts show that the department engaged in facially reasonable efforts, well before this litigation commenced, to assess the effects of a policy change, and then concluded, with ample basis, that the change would not harm inmates.

**B. The Right to Avoid Disclosure of Personal Information**

Claiming that the policy change exposed them to disclosures of their HIV status to other inmates, the plaintiffs assert a violation of a right to privacy under the Fourteenth Amendment. The Supreme Court has implied that the Constitution might protect in some circumstances "the individual interest in avoiding disclosure of personal matters" from government infringement. Whalen v. Roe 429 U.S. 589, 599 (1977). But cf. National Aeronautics & Space Admin. v. Nelson, 131 S. Ct. 746, 751 (2011) (assuming, but declining to confirm, "that the Constitution protects a privacy right of the sort mentioned in Whalen"). For those in prison, however, any right to privacy is inevitably diminished. For example, prison officials may search an inmate's cell without regard to the Fourth Amendment prohibition on

-14-

unreasonable searches.  See Hudson v. Palmer, 468 U.S. 517, 526 (1984).  See also Sanchez v. Pereira-Castillo, 590 F.3d 31, 42-44 (1st Cir. 2009).  Still, while we have never considered the issue, three other circuits have found that prisoners have at least a limited constitutional right against gratuitous disclosures of medical information.[5]

We need not decide in this case whether prisoners have a constitutional right to keep medical information private.  Rather, because the inadvertent and sporadic disclosures here occurred in the context of a reasonable government policy, the plaintiffs cannot prevail even if the department infringed on a privacy interest protected by the Constitution.  In reaching this conclusion, we rely on a recent Supreme Court case rejecting a privacy claim brought by applicants for employment with government contractors.  See Nelson, 131 S. Ct. at 759-61.  There, applying the same precedents relied upon by the plaintiffs here, the Court found no basis to enjoin a policy that required collecting sensitive medical information about the applicants unless the plaintiffs established that the policy was not "reasonable."  See id.  At least the same bar should apply when plaintiffs challenge

---

[5] See Powell v. Schriver, 175 F.3d 107, 112 (2d Cir. 1999) (holding that "gratuitous disclosure of an inmate's confidential medical information as humor or gossip" violates the Constitution); Doe v. Delie, 257 F.3d 309, 317 (3d Cir. 2001) (following Powell); Moore v. Prevo, 379 F. App'x 425, 428 (6th Cir. 2010) (following Powell and Delie).  Both Delie and Moore were accompanied by dissents.

the government's administration of prisons, where state officials face problems "not susceptible to easy solutions" and therefore receive "wide-ranging deference." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

Our preceding analysis of the Eighth Amendment claim demonstrates that the prison's policy was not unreasonable, and that the injunction sought by the plaintiffs would threaten to eliminate significant cost savings while quite possibly posing a risk that gains in overall health would also be lost. The plaintiffs retort that the department could have adopted a narrower policy that would have substantially matched the benefits of its current policy while better protecting their privacy: individualized determinations of how medicine is distributed to each prisoner. [Reply Br. at 26.] Yet, the Supreme Court in Nelson squarely rejected the claim that the government must employ the "least restrictive means of furthering its interest" in order to avoid disclosures of personal information. 131 S. Ct. at 761. On these facts, the use of an otherwise reasonable and customary dispensing practice does not violate any constitutional privacy rights merely because other prisoners may infer what medications a prisoner is taking and what disease he suffers from.

**C. Americans with Disabilities Act and Rehabilitation Act**

In addition to their constitutional claims, the plaintiffs press statutory claims based on the Americans with

-16-

Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794. The parties agree that we need make no distinction between the two statutes for purposes of our analysis in this case. [BB at 18 n. 7; RB at 30 n. 9.] Both statutes provide, in nearly identical language, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 29 U.S.C. § 794(a). The plaintiffs correctly argue that their condition qualifies as a disability under the statutes. See 42 U.S.C.A. § 12102(2)(B).

A plaintiff can press several different types of claims of disability discrimination. First, a plaintiff can assert disparate treatment on account of disability, i.e., that the disability actually motivated the defendant's challenged adverse conduct. See Raytheon Co. v. Hernandez, 540 U.S. 44, 52-53 (2003). Such claims are governed by the same analytic framework governing claims of racial discrimination under Title VII of the Civil Rights Act of 1964. Id. at 50-52; see also Regional Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir. 2002). Alternatively, in an appropriate case a plaintiff can claim that a government policy, though neutral on its face, "fall[s] more harshly on one group than another and cannot be justified by

-17-

business necessity." See Raytheon Co., 540 U.S. at 52 (internal quotation marks omitted); 28 C.F.R. § 35.130(b)(3)(I) (establishing that the ADA prohibits public entities from adopting policies that "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability"). Finally, a plaintiff can pursue a third path, claiming that a public entity has refused to affirmatively accommodate his or her disability where such accommodation was needed to provide "meaningful access to a public service."[6] Henrietta D. v. Bloomberg, 331 F.3d 261, 273-76 (2d Cir. 2003). Although such claims can be seen as bearing many of the indicia of disparate impact or disparate treatment,[7] a plaintiff pursuing such a claim need not directly address and satisfy the elements or methods for proving such theories. See id. at 275.

---

[6] The regulations under the relevant portion of the ADA refer to "reasonable modification," 28 C.F.R. § 35.130(b)(7), while the coordinating regulations under the Rehabilitation Act use the term "reasonable accommodation," 28 C.F.R. § 41.53, but there is no material difference between the terms. See Wong v. Regents of Univ. of California, 192 F.3d 807, 816 n.26 (9th Cir. 1999).

[7] When a disabled person is denied a reasonable accommodation, that person lacks opportunities possessed by similar non-disabled people on account of disability. Such denial can often be seen as creating a disparate impact, which under Title VII routinely involves the unjustified failure to avoid perpetuating a burden arising from history or tradition. Similarly, a denial of reasonable accommodation can resemble disparate treatment if some discriminatory animus is involved. For example, a height test may create an adverse impact on women in the same way that a mobility test may create an adverse impact on people with certain disabilities, absent accommodation.

Here, four of the plaintiffs pursue only a claim of disparate treatment. They argue that the department removed their medications from the KOP program simply because they have HIV, while allowing prisoners with other illnesses to continue utilizing it. These four plaintiffs expressly disavow any claim for reasonable accommodation. [BB at 21.] They also make no mention of a disparate impact theory.

While these plaintiffs assert disparate treatment in the form of "exclusion . . . from the KOP Program," that assertion is not literally correct. [Reply Br. 5.] They can still use the program to receive the same medications that other prisoners can receive through the program. The plaintiffs, of course, need to access HIV medications that other prisoners do not need. But they have not been singled out in this respect: many other medications are also excluded from the program. Moreover, the daily med line provides full access to their HIV medication. Although the plaintiffs regard this as a more burdensome means of access, we see no evidence of any intent by the department to impose that burden on the plaintiffs because they have HIV. See Raytheon Co., 540 U.S. at 52 ("Liability in a disparate-treatment case [under the ADA] depends on whether the protected trait actually motivated the employer's decision." (internal quotation marks, alterations omitted)). Rather, the prison has offered non-discriminatory

grounds for its decision, the reasonableness of which the plaintiffs have been unable to effectively challenge.

In sum, even viewed favorably to the plaintiffs, the record shows that the department provides meaningful access to HIV medications through the daily med line; and its decision to provide access in that manner is driven by cost savings backed up by data suggesting a positive, or at worst neutral, impact on the health of the HIV-positive prison population. On such a record, no jury could find for plaintiffs on their disparate treatment claim.

We next turn to the claim brought by one plaintiff, Richard Nunes, for denial of reasonable accommodation. Nunes claims that he cannot attend the daily med line due to back pain, chronic diarrhea, and other illness. He contends that he is unable to do so even though the department has offered several accommodations: the use of a rolling walker and the ability to sit on a bench or use the bathroom while maintaining his place in line.

Nunes offered no medical evidence supporting this claimed inability. The absence of such evidence is especially pertinent because the record is undisputed that Nunes regularly walks to and from the prison cafeteria and engages in exercise, [App. at 155-56] and that he recently had jobs walking with a blind prisoner and cleaning corridors [App. at 153-154]. In the event Nunes nevertheless becomes so ill that he cannot leave his cell, the department has extended a standing offer to move him to the medical

unit where he can receive his medications daily in accord with normal department procedures applicable to all seriously ill inmates.[8] His only rejoinder is that he does not actually get quite ill enough to need the medical unit, and he would not want to move to the unit because he would lose his current cell and not have as much access to his property. [BB at 41-42.]

But Nunes has provided no evidence that there even exists, much less that he lives within, a medical no man's land between being unable to go to the daily med line and warranting transfer to the medical unit. On such a record, no reasonable factfinder could find the department's accommodations were not a reasonable means of providing Nunes with meaningful access to his medication. The statutes entitle Nunes to reasonable accommodations, not to optimal ones finely tuned to his preferences. See J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d

---

[8] The plaintiffs' brief implies that Nunes was once disciplined for attempting to use the accommodation. [BB at 42.] Nunes's affidavit, however, makes clear that he was actually disciplined for missing a scheduled medical appointment, an entirely different matter. [App. at 2253-2257.]

60, 71-72 (2d Cir. 2000); <u>Corrigan</u> v. <u>Perry</u>, 139 F.3d 888, *8-9 (4th Cir. 1998) (unpublished).[9]

### IV. Conclusion

Although the plaintiffs have raised questions about the wisdom of the department's policies, they have not produced adequate evidence of any constitutional or statutory violation. Consequently, and for the reasons outlined above, we <u>affirm</u> the grant of summary judgment to the defendants on all claims.

<u>So ordered</u>.

---

[9] Like many cases applying the employment prong of the ADA, <u>see</u> <u>Schmidt</u> v. <u>Methodist Hosp. of Indiana, Inc.</u>, 89 F.3d 342, 344-45 (7th Cir. 1996), <u>Corrigan</u> holds that under the Rehabilitation Act an employer need not provide the plaintiff's requested accommodation so long as it provides some reasonable accommodation. The same logic applies here. <u>Cf.</u> <u>Ansonia Bd. of Educ.</u> v. <u>Philbrook</u>, 479 U.S. 60, 68 (1986) (reaching the same conclusion in analyzing employers' obligation to reasonably accommodate religious practices under Title VII).