# United States Court of Appeals
## For the First Circuit

Nos. 12-1622
     12-2142

ALBERT FORD,

Plaintiff, Appellee,

v.

JAMES BENDER AND PETER ST. AMAND,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Judith G. Dein, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Selya and Howard, Circuit Judges.

Nancy Ankers White, Special Assistant Attorney General, with whom William D. Saltzman, Counsel, Department of Correction, was on brief, for appellants.
Lisa J. Pirozzolo, with whom Emily R. Schulman, Timothy D. Syrett and Wilmer Cutler Pickering Hale and Dorr LLP were on brief, for appellee.

September 24, 2014

**HOWARD, Circuit Judge**. The Supreme Court has made clear that a pretrial detainee enjoys a due process right to be free from punishment. Bell v. Wolfish, 441 U.S. 520, 535 (1979). At the same time, a state has a valid interest in promoting the security of detention facilities for the safety of detainees and staff. Id. at 540. This case, concerned with an individual inmate, illustrates one way in which these two interests might come into conflict.

Plaintiff-appellee Albert Ford was held in disciplinary segregated confinement throughout a period of pretrial detention and into a subsequent criminal sentence as punishment for conduct that had occurred while he was imprisoned during a prior criminal sentence. The district court[1] ruled that Ford's punitive disciplinary confinement violated due process, and the court also largely denied two high-ranking prison officials' claims of qualified immunity, awarding Ford partial money damages and equitable relief as well as attorneys' fees and costs.

We reverse the denial of qualified immunity, and therefore reverse the award of money damages against the prison officials in their individual capacities, because we find that the defendants did not violate Ford's clearly established rights. We also vacate on mootness grounds the declaratory and injunctive

---

[1] The parties agreed to proceed before a magistrate judge. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b). We refer throughout to the relevant rulings as those of the district court.

-2-

relief ordered by the district court.  We remand for the district court to determine appropriate attorneys' fees and costs as to any equitable relief not moot when issued.

## I.  BACKGROUND

A summary of the facts and procedural background of the case suffices.  Greater detail is amply provided by the district court's numerous opinions.  See Ford v. Bender (Ford V), 903 F. Supp. 2d 90 (D. Mass. 2012); Ford v. Bender (Ford IV), No. 07-11457, 2012 WL 1378651 (D. Mass. Apr. 19, 2012); Ford v. Bender (Ford III), No. 07-11457, 2012 WL 262532 (D. Mass. Jan. 27, 2012); Ford v. Bender (Ford II) No. 07-11457, 2010 WL 4781757 (D. Mass. Nov. 16, 2010); Ford v. Clarke (Ford I), 746 F. Supp. 2d 273 (D. Mass. 2010).

### Factual Background

In 1992, Ford was sentenced in state court to fifteen to twenty-five years imprisonment in the custody of the Massachusetts Department of Correction (DOC) at the Massachusetts Correctional Institution at Cedar Junction (MCI-Cedar Junction), a state penitentiary in Walpole, Massachusetts.[2]  While serving his sentence, Ford was repeatedly housed in the Department Disciplinary Unit (DDU), a segregated maximum security housing unit, for offenses committed during confinement.  These included being in

---

[2]  Based on his sentence, Ford's anticipated release date would have been between 2007 and 2017.

possession of a weapon, conspiring to introduce heroin, and conspiring to assault other inmates.

In 2002, while housed in the DDU, Ford violently attacked two officers and took a nurse hostage. The officers had escorted Ford to a triage room and adjusted his handcuffs to allow him to test his blood sugar and administer his insulin. While his right hand was un-cuffed, Ford produced a four-and-a-half inch shank from his clothing, stabbed both officers twice, and held the weapon to the nurse's throat until other staff arrived. One officer required immediate medical attention for the puncture wounds in his mid and lower back. In January 2003, after a full disciplinary hearing, Ford was given the administrative sanction of a ten-year term in the DDU, the maximum DDU sanction possible. The hearing officer explained that "Inmate Ford is a danger to staff and his continued placement in the Department's most secure setting is warranted." At that point, Ford had years left on his state sentence of fifteen to twenty-five years imprisonment.

Ford's 2002 misconduct in prison had state law criminal consequences as well. In 2002, he was charged with and indicted for armed assault with intent to murder. See Mass. Gen. Laws ch. 265, §§ 15B, 18.

Ford completed his original criminal sentence on January 6, 2007, less than the twenty-five year maximum; the record is unclear as to why. He remained, however, in the custody of the DOC

as a pretrial detainee for the new criminal assault with intent to murder charge. See id. ch. 276, § 52A. The Deputy Commissioner of Correction at the time, defendant-appellant James Bender, made the decision to keep Ford in the DDU to continue serving his ten-year sanction without a new hearing, despite the change in Ford's status from sentenced inmate to pretrial detainee. Bender testified that, "[b]ased on . . . his entire history, my serious concerns about safety and security of staff and inmates, I felt that the most appropriate placement for him at that time was at DDU."

In March 2007, Ford was granted bail in the pending assault case, and he was released from the DOC's custody. On June 26, 2007, however, the state court revoked his bail based on a charge that he had mailed heroin to an inmate. He was returned to MCI-Cedar Junction. Bender once more consigned Ford, still a pretrial detainee on the pending assault charge, to the DDU to continue serving the previously imposed ten-year sanction, without any new hearing on whether that sanction should be enforced.

In July 2007, Ford first protested his continued confinement in the DDU. Defendant-appellant Peter St. Amand, the Superintendent of MCI-Cedar Junction, advised Ford in a written communique that he was "properly housed in the DDU serving the remainder of a ten (10) year DDU sentence that [he] received [in 2003]." The communique further averred that Ford's status as a

pretrial detainee did not bar the DOC from requiring him to serve out the previously imposed disciplinary sanction.

On April 30, 2008, Ford pled guilty to the pending criminal charges of assault with intent to murder and mailing heroin to an inmate. By pleading guilty to assault with intent to murder, Ford admitted to the same conduct for which the ten-year DDU sanction had been imposed. The court sentenced Ford to four to five years in prison with credit for time served. Bender kept Ford, now a convicted and sentenced inmate, in the DDU to serve out the balance of the ten-year sanction. No additional hearing was held after Ford's guilty plea.

Unsurprisingly, the record reflects that conditions in the DDU are considerably more onerous than conditions of confinement for the general population at MCI-Cedar Junction. While confined in the DDU, an inmate is kept for twenty-three hours a day in a cell measuring seven by twelve feet. Each cell has a solid steel door with a small inset window; a narrow window to the outdoors; a cement bed, desk, and stool; and a toilet visible through the inset window. A DDU inmate typically leaves his cell for only one hour a day to exercise (five days a week) and to shower (three days a week). He is subject to strip searches whenever he enters or leaves his cell. When a DDU inmate is out of his cell for any reason, he is manacled and placed in leg chains.

DDU inmates are socially isolated.  Each inmate receives his meals through a slot in the steel door and is given only twenty minutes to eat.  The prison library is off-limits, although a DDU inmate may receive law books from a "book cart," which requires a formal request and typically results in a wait of eight days.  Communication with other inmates, guards, and the outside world is severely restricted:  at a maximum, four monthly noncontact visits and four monthly telephone calls may be earned as a privilege for good behavior.

While any prisoner would suffer under these severe conditions, Ford was particularly unsuited to them due to his Type I diabetes.  Ford required regular insulin shots and, while in the DDU, he received fewer shots than needed.  This shortfall resulted in blood sugar spikes causing headaches, dizziness, a racing heart, shakes, and tremors.  Diabetic neuropathy led to burning, tingling, and numbness in his feet and ankles.  The leg irons cut his ankles and the numbness exacerbated these cuts, which often became infected.

**Procedural Background**

On July 31, 2007, Ford filed a pro se complaint in the U.S. District Court for the District of Massachusetts.  The court appointed pro bono counsel.

In Ford's second amended complaint, filed on July 11, 2008, he invoked 42 U.S.C. § 1983, charging DOC officials acting in

both their representative and personal capacities, including Bender and St. Amand, with violating his substantive and procedural due process rights. The parties later filed cross-motions for summary judgment on the liability issues. The district court rendered a mixed decision. It ruled that Bender and St. Amand had violated the plaintiff's substantive due process rights by confining him in the DDU as a pretrial detainee, and that Bender had violated the plaintiff's procedural due process rights by continuing to confine the plaintiff in the DDU, both as a pretrial detainee and as a sentenced inmate in 2008, without a new hearing. Ford I, 746 F. Supp. 2d at 288-96. In connection with these rulings, the court largely denied the defendants' quest for qualified immunity, although the court ruled that qualified immunity protected Bender from individual liability for the period during which Ford was a sentenced inmate. Id. at 296-98. Relying on its rulings in the summary judgment memorandum, the court entered a formal declaration that the defendants' actions were unconstitutional. See Ford II, 2010 WL 4781757, at *1. The court rejected a number of other claims against Bender, St. Amand, and other defendants.

A three-day bench trial on the issue of damages and injunctive relief took place on July 25, 26, and 27, 2011. On January 27, 2012, the district court awarded the plaintiff $47,500 in money damages against the defendants in their individual capacities. Ford III, 2012 WL 262532, at *17-18. It also issued

equitable relief, requiring the defendants in their official capacities to ensure the plaintiff's access to transitional programs during the remainder of his sentence and to deem the ten-year disciplinary sanction satisfied.  See id. at *17.

The plaintiff, as the prevailing party, see 42 U.S.C. § 1988(b), moved for attorneys' fees and costs.  The defendants not only opposed this motion but also sought to vacate the judgment. The district court denied the motion to vacate, Ford IV, 2012 WL 1378651, at *2, and awarded the plaintiff $258,000 in attorneys' fees and $20,456.36 in costs, Ford V, 903 F. Supp. 2d at 104.

## II.  ANALYSIS

The defendants filed two appeals, which we consider together.  The defendants challenge: (1) whether the DOC defendants are entitled to qualified immunity on Ford's substantive and procedural due process claims; (2) whether the Prison Litigation Reform Act's (PLRA) physical injury requirement for recovering damages is satisfied; (3) whether the equitable relief ordered by the district court is rendered moot by Ford's conviction on the assault charge or, alternatively, by his ultimate release from prison; and (4) whether the award of attorneys' fees should be reversed.  Given our holdings on qualified immunity, we need not address the defendants' contention under the PLRA.  The other issues we take up in turn.

## A. **Qualified Immunity**

The district court decided the qualified immunity issue on summary judgment, holding that the defendants are not entitled to qualified immunity for their conduct during the period that Ford was a pretrial detainee.[3]  See Ford I, 746 F. Supp. 2d at 280.  We review de novo a district court's entry of summary judgment, considering whether the moving party is entitled to judgment as a matter of law.  See Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009); see also Fed. R. Civ. P. 56(a).  That standard is unaffected where, as here, cross-motions for summary judgment are in play. See Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005).  As with all determinations made at the summary judgment stage, in determining whether qualified immunity is appropriate, we view the facts in the light most favorable to the nonmovant.  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014).

Qualified immunity is a judge-made doctrine designed to curtail the legal liability of public officials.  See Pagán v. Calderón, 448 F.3d 16, 31 (1st Cir. 2006).  All state actors except "the plainly incompetent [and] those who knowingly violate the

---

[3]    While the district court found that Ford's continued confinement in the DDU without a new hearing after he was convicted of the assault was also a violation, the court found that the law was not clearly established at the time and therefore granted qualified immunity on this claim.  Ford I, 746 F. Supp. 2d at 298. The defendants' appeal of the qualified immunity ruling therefore focuses exclusively on whether defendants' confinement of Ford in the DDU as a pretrial detainee was clearly unconstitutional at the time.

law," are shielded from individual liability for damages under this doctrine. Malley v. Briggs, 475 U.S. 335, 341 (1986).

A two-part framework governs whether a defendant is entitled to qualified immunity. See Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011). First, we inquire whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation. See Pearson v. Callahan, 555 U.S. 223, 232 (2009). Second, we inquire whether the violated right was clearly established at the time that the offending conduct occurred. See id. The second, "clearly established," step itself encompasses two questions: whether the contours of the right, in general, were sufficiently clear, and whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).

Federal courts have discretion to bypass the first step of the qualified immunity framework and to focus instead on the second step. Id. at 269-70. The defendants ask us to do so here. They state that the issue before the court is whether reasonable prison officials would have understood "that continuing a lawful DDU sanction during a subsequent period of pretrial detention constituted impermissible punishment proscribed by Bell" and that the "2003 ten-year DDU sanction did not provide adequate process for [Ford's] 2007-2008 pretrial DDU placement." We find that

-11-

reasonable officials in the defendants' shoes would not have understood that their actions violated the plaintiff's constitutional rights.  Since the law was not clearly established, the defendants are entitled to qualified immunity.

In reaching this conclusion, we consider the plaintiff's substantive and procedural due process claims separately.[4]  The right to substantive due process "implicates the essence of state action rather than its modalities."  Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990).  This right protects individuals from state actions that are "arbitrary and capricious," "run counter to the concept of ordered liberty," or "appear shocking or violative of universal standards of decency."  Id. at 753-54 (internal quotation marks omitted).  The heartland of the right to procedural due process, as the name implies, is a "guarantee of fair procedure." Zinermon v. Burch, 494 U.S. 113, 125 (1990).  This right assures individuals who are threatened with the deprivation of a significant liberty or property interest by the state notice and an opportunity to be heard "'at a meaningful time and in a meaningful manner.'"  Amsden, 904 F.2d at 753 (citing Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  The merits of the deprivation itself are

_____

[4]  The plaintiff framed his due process claims in terms of both the Due Process Clause, U.S. Const. amend. XIV, and the parallel provisions of the Massachusetts Declaration of Rights. The parties have agreed that the same standards govern both the federal and state claims.  For economy in exposition, we discuss only the federal constitutional claims.

-12-

immaterial to the procedural due process analysis. <u>Carey</u> v. <u>Piphus</u>, 435 U.S. 247, 266 (1978). We discuss separately the substantive and procedural due process claims before us to determine whether Ford can make out a violation under either of a right that was clearly established in 2007-2008.

**Substantive Due Process**

By definition, pretrial detainees have not been convicted of the crime or crimes with which they are charged. Consequently, they receive constitutional protections superior to those afforded sentenced inmates. <u>Bell</u>, 441 U.S. at 535-36. Chief among these distinctions is that a pretrial detainee has a substantive due process right to be free from punishment. <u>See</u> <u>id.</u> at 534-35 & n.16; <u>Surprenant</u> v. <u>Rivas</u>, 424 F.3d 5, 13 (1st Cir. 2005).

Punishment in the present context, however, is a term of art. What is prohibited is "punishment in the constitutional sense," not mere "restrictions and conditions accompanying pretrial detention." <u>Bell</u>, 441 U.S. at 538. In <u>Bell</u>, the plaintiffs challenged their general conditions of confinement, such as the practice of double bunking detainees and restrictive rules on receiving packages from outside the facility. The Supreme Court declared in <u>Bell</u> that the test of whether a condition is in fact punishment is whether "the disability is imposed for the purpose of punishment." <u>Id.</u> A punitive purpose may be demonstrated through either expressed intent or through inference, for example if a rule

-13-

or regulation is disproportionate to, or not reasonably related to, a legitimate, non-punitive goal. Id. at 538-39; see also Surprenant, 424 F.3d at 13.

Here, the defendants have repeatedly admitted that Ford's pretrial detention in the DDU had a punitive purpose. For example, Bender acknowledged forthrightly in testimony before the district court that his decision to confine Ford to the DDU in 2007 was "[a]bsolutely" intended to punish. The purpose of the DDU confinement, he declared, was to punish Ford for the assault for which he was awaiting trial. Similarly, St. Amand's communique noted that the purpose of Ford's segregated pretrial confinement was to continue serving his punitive DDU sanction. The district court relied on the defendants' plain expressions of punitive intent to find that the plaintiff's tenure in the DDU as a pretrial detainee constituted impermissible punishment and, therefore, abridged his right to substantive due process.

While Bell provides clear guidance about the constitutional bounds of conditions of confinement for pretrial detainees, Bell does not clearly address whether and when punishment is permitted as an individualized disciplinary sanction for a pretrial detainee's misconduct. In Collazo-Leon v. United States Bureau of Prisons, 51 F.3d 315 (1st Cir. 1995), we upheld a disciplinary sanction confining a pretrial detainee in the DDU for ninety days because he tried to bribe his way out of jail. Id. at

-14-

318-19.  We noted that <u>Bell</u> was not written to address a "situation where discrete sanctions were imposed on individual pretrial detainees as discipline for specific in-house violations."  When it comes to individualized discipline, we held that "[t]he inquiry . . . does not end with the designation of a condition of confinement as 'punishment.'"  <u>Id.</u> at 317.  Instead of relying on a distinction between whether this discipline was punishment or not, which we deemed "semantic," we stated that we did not find that there is any meaningful distinction between the terms 'punishment' and 'discipline'" in the context of an individualized disciplinary response, <u>id.</u>, and upheld the punitive DDU sanction of the detainee as a valid exercise of reasonable disciplinary power.  <u>Id.</u> at 318-19.

Ford argues that <u>Collazo-Leon</u> concerned a very different factual scenario, one in which the disciplinary infraction and the disciplinary hearing occurred during the pretrial detention itself, whereas Ford's DDU confinement in 2007-2008 was punishment for an offense committed years earlier when he was serving a prior criminal sentence.  Ford might be right that the timing of a disciplinary infraction--during the pretrial detention itself as opposed to during a prior period of incarceration--affects the question of whether pretrial disciplinary segregation violates

substantive due process.[5]  The critical inquiry in deciding this appeal, however, is whether any reasonable official in these circumstances would have understood that the continuing disciplinary sanction, imposed when Ford was a pretrial detainee on different charges, for conduct that occurred during a prior period of incarceration, violated Ford's constitutional right to substantive or procedural due process.

Collazo-Leon does not definitively answer whether Ford's detention was constitutional or not.  It does, however, plainly hold that determining whether an act is punitive does not end the constitutional inquiry in the case of an individualized disciplinary process.  Collazo-Leon thus illustrates why Bell alone does not show that the right at issue here was clearly established.

_____

[5]  There is no controlling case law that clearly addresses the question of whether the misconduct for which a detainee is being disciplined must necessarily be from the current period of pretrial detention.  Nonetheless, courts have recognized only an exception to the prohibition on pretrial punishment for disciplinary infractions when narrowly focused on the facility's interest in "the effective management of the detention facility once the individual is confined."  Bell, 441 U.S. at 540.  See, e.g., Collazo-Leon, 51 F.3d at 317 (referring to "discrete sanctions [that] were imposed on individual pretrial detainees as discipline for specific *in-house violations*"(emphasis added)); Surprenant, 424 F.3d at 13 (noting that "a pretrial detainee may be disciplined for a specific institutional infraction *committed during the period of his detention*"(emphasis added)).  See also, Rapier v. Harris, 172 F.3d 999, 1003 (7th Cir. 1999)("Notably, the basis for this punishment is not the underlying crime of which he stands accused; rather, this punishment is based upon the *detainee's actions while in pretrial confinement*."(emphasis added)).

-16-

The defendants rely on cases that address the nature of disciplinary sanctions, pointing to authorities holding that prison disciplinary sanctions are civil proceedings that are distinct from criminal punishment, at least for purposes of the Double Jeopardy Clause, see Commonwealth v. Forte, 671 N.E.2d 1218 (Mass. 1996), and that disciplinary sanctions may be continued during non-consecutive criminal sentences, see, e.g., Pletka v. Nix, 957 F.2d 1480, 1485 (8th Cir. 1992) (en banc); In re Pridgett, No. 01-P-259, 2003 WL 1524678 (Mass. App. Ct. Mar. 25, 2003). While these cases may be read as providing some support for the defendants' position, they do not concern pretrial detainees specifically.

In addition to these cases, however, the defendants also rely on a state court ruling that addressed a situation involving pretrial detention under facts nearly identical to those in Ford's case. Karnes v. Nolan, No. 2005-01854 (Mass. Super. Ct. Nov. 2, 2006) was a decision issued by the Massachusetts Superior Court in favor of MCI-Cedar Junction, the same facility where Ford was housed, just two months before Ford's original sentence ended and his pretrial detention began. In Karnes, a sentenced prisoner at MCI-Cedar Junction committed an assault for which he received a disciplinary report. Id., slip op. at 2. Before a disciplinary hearing was held, Karnes completed his sentence and was released to the custody of Middlesex County to await trial on pending unrelated charges. Id. Karnes was then also criminally charged with the

assault that he had committed at MCI-Cedar Junction, and was returned to MCI-Cedar Junction as a pretrial detainee to await trial on both new charges.  Id.  Prison officials held the previously scheduled disciplinary hearing, and Karnes received a disciplinary sanction of five years in the DDU.  Id.  Karnes filed a complaint in the Massachusetts Superior Court for a declaratory judgment that the superintendent had violated his due process rights and for injunctive relief.[6]

The Superior Court rejected Karnes's argument that "his commitment to the DDU based on a disciplinary infraction committed during an elapsed independent sentence was improper because of his status as a pre-trial detainee."  Id. at 6.  The court did not cite Bell, Collazo-Leon, or any other precedent concerning impermissible punishment, stating instead only that "[c]ommitment to the DDU is a civil proceeding that is separate and independent from the criminal process according to which the plaintiff was detained."  Id. at 6-7 (citing Commonwealth v. Bloom, 760 N.E.2d 297 (Mass. App. Ct. 2001)).  The court concluded that confinement in the DDU

---

[6]  The district court distinguished a later decision by the Massachusetts Appeals Court in Commonwealth v. Karnes, 68 Mass. App. Ct. 1118, 2007 WL 1217695 (Apr. 25, 2007), which concerns the same detainee in a subsequent suit after he was convicted, as not directly addressing the question of due process but rather the question of double jeopardy.  The initial Karnes case, discussed here, specifically sought a declaratory judgment concerning the constitutionality of pretrial disciplinary punishment for conduct that occurred during a prior incarceration, the exact factual scenario that the defendants faced with Ford.

did not violate the pretrial detainee's due process rights.

Although the reasoning of <u>Karnes</u> may not be robust, the facts are nearly identical to this case. The Superior Court's ruling in <u>Karnes</u> would have appeared to be relevant guidance to officials at MCI-Cedar Junction in 2007-2008, and it would have been reasonable for the defendants to have relied on it.[7] Whether or not we agree with the holding of <u>Karnes</u>, "[i]f judges thus disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy." <u>Wilson</u> v. <u>Layne</u>, 526 U.S. 603, 618 (1999).

The Supreme Court's statement in <u>Bell</u> that "[d]ue process requires that a pretrial detainee not be punished," 441 U.S. at 535 n.16, must be scrupulously honored. But that statement does not foreclose consideration of important institutional interests, as set forth in <u>Collazo-Leon</u>, 51 F.3d 315, concerning disciplinary sanctions that may properly be imposed on a pretrial detainee. <u>See</u> <u>Brady</u> v. <u>Dill</u>, 187 F.3d 104, 115 (1st Cir. 1999) (for purposes of qualified immunity, "courts must define the right . . . at an

---

[7] In highlighting the defendants' reasonable reliance on an unpublished state trial court decision, we do not mean to indicate that such an opinion could be sufficient to show "clearly established law." To the contrary, here, our reliance on this unpublished opinion is to show the *absence* of clearly established law. There are a number of important factors that make it particularly appropriate for us to rely on this case here. The decision was directed to the same facility where Ford was held (MCI-Cedar Junction); it is the closest factual analog to Ford's situation; and there is no clear consensus in other case law concerning this specific issue.

-19-

appropriate level of generality").  The right at issue here is not the right of a pretrial detainee to be free from punishment generally, but rather the right of a pretrial detainee to be free from punishment that was validly imposed while serving a prior criminal sentence.  Neither Bell nor Collazo-Leon clearly answers this question.  Viewed at the appropriate level of generality, particularly in light of the decision that MCI-Cedar Junction had just received in Karnes, we cannot say that all reasonable prison officials would have known that holding Ford in the DDU during his pretrial detention for an offense that occurred during a prior criminal sentence was unconstitutional.  Any violation of Ford's right to substantive due process was not a violation of clearly established law as of 2007-2008.  We conclude, therefore, that the defendants were entitled to qualified immunity with respect to the alleged violation of the plaintiff's right to substantive due process.

**Procedural Due Process**

The district court also concluded that defendant Bender violated the plaintiff's right to procedural due process by confining him in the DDU as a pretrial detainee without a fresh hearing and that Bender was not entitled to qualified immunity with respect to that violation.  See Ford I, 746 F. Supp. 2d at 292-95, 297-98.  Bender disputes these conclusions, contending that the 2003 hearing constituted adequate process for the entire

-20-

disciplinary confinement that followed, regardless of Ford's change in status.

Even when prison officials permissibly may punish a pretrial detainee for discrete violations of facility rules, they must provide him with adequate process. See Surprenant, 424 F.3d at 17-18. Bender does not contest that Ford had a liberty interest sufficient to trigger procedural safeguards.

It is, moreover, well established that the process that a pretrial detainee must be afforded at a disciplinary hearing is that set forth by the Supreme Court in Wolff v. McDonnell, 418 U.S. 539, 564-71 (1974). See Surprenant, 424 F.3d at 18; Benjamin v. Fraser, 264 F.3d 175, 189-90 (2d Cir. 2001); Mitchell v. Dupnik, 75 F.3d 517, 525 (9th Cir. 1996). This is the same process to which Ford was entitled as a convicted inmate. See Smith v. Mass. Dep't of Corr., 936 F.2d 1390, 1398-99 (1st Cir. 1991). Withal, Ford was given a disciplinary hearing prior to being placed in the DDU in 2003 and has not challenged that process as inadequate. Nor does Ford identify any different or additional procedures to which he may have been entitled as a result of his change in status. While it was clear in 2007-2008 that Ford had to be given a hearing before being punished for rules violations, the question we must answer is whether it was clearly established that an otherwise adequate hearing held when he was a convicted inmate would not suffice.

-21-

The purpose of a disciplinary hearing is to allow the accused (be it a convict or a pretrial detainee) to contest whether he in fact committed the infraction. See Wolff, 418 U.S. at 558, 564-65. Ford identifies no practical purpose that would be served by holding a second, redundant hearing to establish his culpability. At any rate, given the dearth of case law suggesting that pretrial detainees are entitled to anything more than the procedures set forth in Wolff, reasonable prison officials could have concluded that the 2003 hearing constituted adequate process. Accordingly, Bender is entitled to qualified immunity on Ford's procedural due process claim.

## B.  **Equitable Relief**

In addition to money damages, now reversed, the district court issued declaratory and injunctive relief. On September 30, 2010, the district court held that (1) Bender and St. Amand had violated Ford's substantive due process rights by confining Ford in the DDU as a pretrial detainee as punishment for his 2002 conduct, (2) Bender had violated Ford's procedural due process rights in 2007 by confining him in the DDU without a new hearing as a pretrial detainee on the state criminal assault charge, and (3) Bender had violated Ford's procedural due process rights in 2008 by confining him in the DDU without a new hearing as a convicted felon serving a sentence. Ford I, 746 F. Supp. 2d at 279-80. The district court entered declaratory judgment along the same lines in

an order dated November 16, 2010.[8] <u>Ford II</u>, 2010 WL 4781757, at *1.  On January 27, 2012, after a three-day bench trial, the district court issued an injunction ordering the DOC to (1) "ensure that Ford has, and continues to have for the remainder of his sentence, opportunities to participate in any transitional programs that are available to the general population inmates," and (2) "deem satisfied Ford's 10-year DDU sanction that was issued in 200[3]."  <u>Ford III</u>, 2012 WL 262532, at *18.

On August 4, 2011, Ford was transferred from the DDU to the general population at MCI-Cedar Junction.  On April 17, 2012, Ford was released from DOC custody altogether.  The defendants argue that the equitable relief was moot when entered, or rendered moot by Ford's release.[9]  Ford responds that the injunctive and

---

[8]  Ford argues that the declaratory judgment is not properly before us because the defendants failed to designate the separate declaratory judgment order in their notice of appeal as required by Federal Rule of Appellate Procedure 3(c).  Failure to designate a particular order for appeal is typically fatal.  <u>Shelby</u> v. <u>Superformance Int'l, Inc.</u>, 435 F.3d 42, 45 (1st Cir. 2006).  The purpose of Rule 3, however, is to give the court and opposition notice of the issues challenged on appeal.  <u>Markel Am. Ins. Co.</u> v. <u>Díaz-Santiago</u>, 674 F.3d 21, 26 (1st Cir. 2012).  In their notice, the defendants designated the memorandum of decision, which contained the same rulings as the separately issued declaratory judgment order.  Given the nearly identical language in the memorandum and the order in this case, we will examine the merits of the defendants' argument.

[9]  The defendants only briefly contest the district court's holding that they violated Ford's rights when they confined him in the DDU as a pretrial detainee, and do not discuss the district court's holding that they violated Ford's rights when they confined him in the DDU as a sentenced inmate.  Even if the defendants had fully briefed the merits of the constitutional issues on appeal,

declaratory relief "was properly entered by the district court but was subsequently rendered partially moot by Mr. Ford's release from custody and the DOC's cancellation of Mr. Ford's DDU sanction." As a result of Ford's release from DOC custody, we conclude that Ford's claims for equitable relief no longer present a live case or controversy. We therefore vacate the district court's judgment.

The baseline doctrinal principles of mootness are familiar. The Constitution "confines the jurisdiction of the federal courts to actual cases and controversies." Barr v. Galvin, 626 F.3d 99, 104 (1st Cir. 2010) (internal quotation marks omitted). See U.S. Const. Art. III, § 2. "A case generally becomes moot when the controversy is no longer live or the parties lack a legally cognizable interest in the outcome." Shelby v. Superformance Int'l, Inc., 435 F.3d 42, 45 (1st Cir. 2006) (internal quotation marks and alterations omitted). Events subsequent to a district court's entry of judgment may render a case moot and preclude appellate review of the merits. See Libertarian Party of N.H. v. Gardner, 638 F.3d 6, 12 (1st Cir. 2011); Diffenderfer v. Gomez-Colon, 587 F.3d 445, 451 (1st Cir. 2009). When this occurs, courts of appeals normally will vacate the judgment below. See Diffenderfer, 587 F.3d at 451. The incidence of mootness presents a purely legal question and,

which they did not, we need not reach the constitutionality of the defendants' actions since we find Ford's claims for equitable relief to be moot.

-24-

therefore, engenders de novo review.  See Culhane v. Aurora Loan Servs. of Neb., 708 F.3d 282, 289 (1st Cir. 2013).

A prisoner's challenge to prison conditions or policies is generally rendered moot by his transfer or release.  See, e.g., Jordan v. Sosa, 654 F.3d 1012, 1027 (10th Cir. 2011); Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009); Oliver v. Scott, 276 F.3d 736, 741 (5th Cir. 2002); Scott v. District of Columbia, 139 F.3d 940, 941 (D.C. Cir. 1998).  In Incumaa v. Ozmint, the Fourth Circuit persuasively reasoned that,

> Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim.  Any declaratory or injunctive relief ordered in the inmate's favor in such situations would have no practical impact on the inmate's rights and would not redress in any way the injury he originally asserted.

507 F.3d 281, 287 (4th Cir. 2007).  Following this reasoning, the Fourth Circuit found that a prisoner's challenge to a publication ban in the maximum security unit became moot when the prisoner was released from the unit.  Id.

In this case, Ford's release from DOC custody rendered moot all of his claims for equitable relief.  Once released from custody, Ford lost any legally cognizable interest in a declaration that the DOC's actions had been unconstitutional or an injunction related to his prior confinement.  There is no "live case or controversy" to decide, nor any meaningful relief to provide, now

-25-

that Ford has been released. "With limited exceptions, not present here, issuance of a declaratory judgment deeming past conduct illegal is also not permissible as it would be merely advisory." Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 53 (1st Cir. 2013).

Ford concedes that the first injunction, ordering the DOC to provide him with access to transitional programs "for the remainder of his sentence," expired, by its own terms, upon Ford's release. Ford agrees that he no longer has a legally cognizable interest in this relief and that vacatur is proper.

Ford likewise concedes that he no longer has an interest in a declaration related to his detention in the DDU as a sentenced inmate without a new hearing. Ford concedes that "the mootness actually occurred when Defendants voluntarily transferred Mr. Ford to the general population prior to the expiration of his 10-year DDU sanction." But Ford argues against vacatur since "it was Defendants' own acquiescence that caused the declaratory relief to become moot." The argument fails. Vacatur is appropriate in this case since the issue would have become moot when Ford was released from custody even if the DOC had not voluntarily released him from the DDU. See Diffenderfer, 587 F.3d at 451-52 (declining to address the possibility that the case was rendered moot by voluntary action before intervening, independent event and vacating judgment below).

-26-

As to his remaining claims for equitable relief, Ford invokes an exception to the mootness doctrine for conduct that is "capable of repetition, yet evading review." He bears the burden of establishing this exception. To do so, Ford must show "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation or a demonstrated probability that the same complaining party will be subject to the same action again." Libertarian Party of N.H., 638 F.3d at 12 (quoting FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 462 (2007)). Ford's assertions fail to satisfy the exception's second requirement, since there is no reasonable expectation that he will again be confined to the DDU as a pretrial detainee, without a hearing, as an administrative sanction for conduct that occurred while he was serving a prior sentence.

Ford argues that he faces, as a matter of law, a reasonable probability of re-arrest "[b]ecause he has a criminal record." Ford was convicted in 1992, and then again in 2008 for a crime committed while imprisoned on the original 1992 charge. We disagree that this criminal record provides a reasonable expectation or demonstrated probability that he would again re-offend once he was released from confinement for the 2008 conviction. The Supreme Court has advised that, "for purposes of assessing the likelihood that state authorities will reinflict a

-27-

given injury, we generally have been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury." Honig v. Doe, 484 U.S. 305, 320 (1988). Ford's two prior convictions are thus insufficient to establish a reasonable expectation that he will re-offend,[10] and his remaining claims for equitable relief are not saved from mootness.

## C. Attorneys' Fees

Finally, we turn to the defendants' separate appeal of the district court's award of attorneys' fees and costs. Ford V, 903 F. Supp. 2d at 103-04. To reiterate, all claims for damages have been dismissed and all claims for equitable relief are moot. Ford may, nevertheless, remain a "prevailing party" for the purpose of attorneys' fees and costs under § 1988 if he "clearly succeeded in obtaining the relief sought before the district court and an intervening event rendered the case moot on appeal."[11]

---

[10] Although Ford stated in his response that he "was rearrested following his April 2012 release and [was] again in the custody of the DOC awaiting trial," he provided no further details concerning the nature or disposition of the charges. In any event, this assertion does not affect our analysis.

[11] We must "apply this test by looking only to what relief the district court granted and not to whether the case was rightly decided." Diffenderfer, 587 F.3d at 453; see also Ctr. for Biological Diversity v. Marina Point Dev. Co., 566 F.3d 794, 805-06 (9th Cir. 2008) (noting "the wide agreement by appellate judges that they should not undertake to delve into the details of a district court's resolution of a controversy that has since become moot in order to decide the ancillary question of fees").

Diffenderfer, 587 F.3d at 454. We analyze the declaratory judgment and the subsequent injunction separately.

On April 30, 2008, Ford pled guilty to the charges of assault with intent to murder and mailing heroin to an inmate, and remained in the DDU as a convicted inmate. On November 16, 2010, the district court entered declaratory judgment relating to Ford's rights as a pretrial detainee and as a convicted inmate.

The declaratory judgment related to Ford's rights as a pretrial detainee was moot when issued. At this point in time, Ford was no longer a pretrial detainee. The declaratory judgment amounted to an advisory opinion concerned with past alleged wrongs. The district court tried to escape this conclusion by finding Ford's challenge "capable of repetition, yet evading review." Ford I, 746 F. Supp. 2d at 285-87. The district court's analysis clearly conflicts with our holding today, and we reverse for the same reasons explained above. Ford cannot retain the status of a "prevailing party" for relief that was moot when issued.

The declaratory judgment addressed to Ford's rights as a convicted inmate, to the contrary, was not moot when entered. At that time, Ford was a convicted inmate in the DDU without the benefit of a new hearing. Ford successfully obtained the relief sought before the district court even if we must vacate it now.

On August 4, 2011, the DOC transferred Ford from the DDU to the general population at the correctional facility. On January

27, 2012, the district court issued two injunctions to ensure Ford's access to transitional programs that were available to general population inmates, and to deem satisfied Ford's 2003 DDU sanction.

The first injunction, ensuring Ford's access to transitional programming for the remainder of his sentence, was not moot when issued since Ford was still in DOC custody. Both experts agreed that the programs were important to help Ford prepare for his expected release. Even though subsequently mooted, Ford was a "prevailing party" on this point before the district court.

Ford cannot, however, be deemed a "prevailing party" with respect to the district court's second injunction, requiring the defendants to deem the 2003 administrative sanction satisfied. The district court's injunction was moot when issued, since it lifted a sanction that was no longer in effect. Ford argues that the injunction "served the important purpose of ensuring that the 2003 DDU sanction could no longer serve as the basis of Mr. Ford's unlawful DDU confinement." There was no reasonable expectation, however, that Ford would return to DOC custody as a pretrial detainee. Moreover, the defendants would then be flouting the declaratory judgment, now in effect, were they to return Ford to the DDU without a new hearing on the basis of the 2003 sanction.

For these reasons, Ford can only be considered a "prevailing party" for the district court's declaratory judgment

related to convicted inmates, and the district court's injunction related to transitional programming. We remand to the district court to determine the appropriate amount of attorneys' fees and costs for these two forms of relief.

## III. CONCLUSION

For the reasons above, we reverse the district court's decision that the defendants are not entitled to qualified immunity, reverse the award of money damages, vacate all equitable relief, and remand for reconsideration of a more limited claim of attorneys' fees and costs.

**<u>So ordered</u>.**