# United States Court of Appeals
## For the First Circuit

No. 19-2018

EMORY SNELL,

Plaintiff, Appellant,

v.

THOMAS NEVILLE, PATRICIA RUZE, MASSACHUSETTS DEPARTMENT OF
CORRECTION, CAROL MICI, STEPHANIE COLLINS, LOIS RUSSO, DALE
BISSONNETTE, DOUGLAS DEMOURA, JEFFREY J. QUICK, MONSERRATE
QUINONES, and JOANN LYNDS,

Defendants, Appellees,

THOMAS DICKHAUT, Superintendent, THOMAS A. GROBLEWSKI, GREG A.
POLADIAN, THERESA SMITH, ROBERT CONLEY, CLESELY M. GARCIA,
PHILIP H. KONG, KEVIN ANAHORY, GENE CHAISSION, JOHN A. BELAIR,
THOMAS DEMOURA, JANE ROE, and JOHN DOE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise Casper, U.S. District Judge]

Before

Thompson and Kayatta, Circuit Judges.[*]

---

[*]Judge Torruella heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's opinion. The remaining two panelists
therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

Lucas I. Silva, with whom Sommer Wiss, Andrew C. Yost, and Foley Lardner LLP were on brief, for appellant.

Mary Eiro-Bartevyan, Department of Correction Legal Division, Nancy Ankers White, Special Assistant Attorney General for appellees Thomas Neville, Massachusetts Department of Correction, Carol Mici, Stephanie Collins, Lois Russo, Dale Bissonnette, Douglas Demoura, Jeffrey Quick, Monserrate Quinones, and Joann Lynds.

George J. Puddister IV, with whom Victor J. Koufman and Koufam & Frederick, LLP were on brief, for appellee Patricia Ruze.

———————————

May 25, 2021

———————————

THOMPSON, **Circuit Judge**.  Americans are reputedly a litigious bunch, and Emory Snell, an inmate at MCI-Concord in Massachusetts, has greatly aided in keeping the federal and state judiciaries busy.  In this lawsuit, one of at least 170 he has filed challenging his conviction and his prison conditions, Snell's legal focus is on a first-floor Lexis Nexis terminal and typewriter (collectively "the first-floor Terminal" or "the Terminal") where he spent two plus years conducting legal research and cranking out legal documents.[1]  Regrettably for Snell, prison officials nixed his habit upon learning he was using the resources without a diagnosed disability preventing him from climbing stairs to the second-floor law library.  Not appreciating this purported lack of accommodation, Snell sued various prison officials as well as the Massachusetts Department of Correction (collectively, "DOC defendants"), and his prison physician, Dr. Patricia Ruze, for injunctive and declaratory relief and damages.  Finding no merit to Snell's complaint, the district court granted summary judgment to all defendants.  See Snell v. Mici, No. 16-cv-11643-DJC, 2019

---

[1]  A Lexis Nexis terminal is a computer that allows users to access only the Lexis Nexis legal research services without getting into other parts of the internet.

WL 4303264 (D. Mass. Sept. 11, 2019).  Snell appeals part of that order alleging several claims of error.[2]  Espying none, we affirm.[3]

## Background

In order to understand the legal issues addressed in our decision, we find it necessary to provide the reader with a detailed background of events which triggered this appeal. Therefore, we ask the reader's patience as we soldier through the facts.

---

[2] Because Snell does not challenge the district court's grant of summary judgment for his other claims raised below, he has waived his right to appeal those counts, and we will not consider them.  See Bekele v. Lyft, Inc., 918 F.3d 181, 186-87 (1st Cir. 2019).

[3] Defendants raise a number of arguments about why we should affirm summary judgment, including qualified immunity, Snell's failure to plead sufficient facts proving the personal involvement of all defendants, and Snell's failure to exhaust his administrative remedies.  Because we affirm summary judgment on other substantive grounds, we need not reach those arguments. See F.D.I.C. v. LeBlanc, 85 F.3d 815, 820 (1st Cir. 1996) (noting that we may affirm summary judgment on any independently sufficient ground); see also Mihos v. Swift, 358 F.3d 91, 98-99 (1st Cir. 2004) (assuming qualified immunity is inapplicable does not equate to a victory for the plaintiff).  Also, because we affirm summary judgment on all counts, we need not differentiate between the defendants' individual and official capacities insofar as those distinctions would otherwise matter for the analyses that follow. See, e.g., Parker v. Landry, 935 F.3d 9, 14 & n.3 (1st Cir. 2019) (claims pursuant to 42 U.S.C. § 1983 cannot apply to state entities or state employees in their official capacities); Bartolomeo v. Plymouth Cnty. House of Corr., 229 F.3d 1133, *1 (1st Cir. 2000) (per curiam) (assuming without deciding that individuals may be subject to personal liability under Title II of the ADA and Section 504 of the Rehabilitation Act).

When a party appeals from a district court's grant of summary judgment, we describe the facts in the light most favorable to the non-moving party (here, Snell), so far, at least, as a reasonable review of the record obliges. See Nunes v. Mass. Dept. of Corr., 766 F.3d 136, 138 (1st Cir. 2014); see also Santiago-Ramos v. Autoridad de Energía Eléctrica de Puerto Rico, AEE, 834 F.3d 103, 105 (1st Cir. 2016) (quoting Chaloult v. Interstate Brands Corp., 540 F.3d 64, 66 (1st Cir. 2008) ("drawing all inferences in" the non-movant's favor)).

**The Accommodation Process and Two-Tiered Library at MCI-Concord**

After a jury convicted Snell of the first-degree murder of his wife in 1995, he began serving a life without parole sentence in the Massachusetts prison system, eventually landing at the facility known as MCI-Concord in 2010. See Commonwealth v. Snell, 705 N.E.2d 236, 238-39 (Mass. 1999). Snell arrived there in less than stellar health. Amongst other ailments, he suffered knee and back pain, and had degenerative joint disease which limited his body's range of motion.[4] A walking cane facilitated his mobility. In consequence, upon his confinement, he began to seek ways to better manage and endure his terms of incarceration. Therefore, before delving into the details of Snell's particular

---

[4] Degenerative joint disease, also known as osteoarthritis, is the deterioration of the skeleton's cartilage or bony structures.

claims, some background on MCI-Concord's protocols for servicing prisoners with physical disabilities is in order.

During the time period relevant to this appeal, incarcerated persons like Snell had a couple of avenues to attain relief. First, inmates could seek reasonable accommodations from prison officials if they had physical or mental health disabilities which prevented them from engaging in the standard routines of prison life, such as a prison education or technical training program. See 103 DOC 620, https://www.mass.gov/doc/doc-620-special-health-care-practices/download; 103 DOC 408.07, https://www.mass.gov/doc/doc-408-reasonable-accommodations-for-inmates/download.[5] For example, an individual with hearing loss could request a hearing aid or a person with walking difficulties could request a wheelchair. An inmate did not need to have a medically documented disability to apply for such a reasonable accommodation. See 103 DOC 620.

Second, inmates could also seek a "medical restriction" from a medical professional. For instance, if a prison physician advised an inmate not to climb stairs because such movement would be harmful to the person's health, the inmate would have a "no-stairs" medical restriction. A medical restriction traditionally

---

[5] During the period in which the defendants allegedly harmed Snell, a different version of the regulations was in effect, see 103 DOC 207.04, but they are functionally equivalent for the purposes of our analyses.

- 6 -

lasted for a maximum of one year, after which a physician would have to renew it. But prison officials did accord indefinite restrictions in some instances for individuals diagnosed with long-term disabilities. A medical restriction, though, did not automatically translate into an accommodation.

MCI-Concord followed prison regulations promulgated by the Department of Correction when deciding whether to grant a reasonable accommodation to an inmate, and Snell does not contend MCI-Concord ignored them. Inmates could request accommodations by: (1) asking any DOC staff member; (2) filling out a written accommodation request; or (3) asking medical staff for a restriction that the DOC defendants could translate into an accommodation. See 103 DOC 408.07(8). One of the DOC defendants, the facility's American with Disabilities Act ("ADA")[6] coordinator, reviewed such requests, filed written proof of the accommodation (if granted), and provided written proof of the accommodation directly to the requesting inmate. The regulations required the DOC defendants to "[e]nsure that appropriate documentation

---

[6] The ADA protects individuals from facing discrimination based on any disability. Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 801 (1999) ("The ADA seeks to eliminate unwarranted discrimination against disabled individuals in order . . . to guarantee those individuals equal opportunity . . . .."). We will provide more details about the law's specific protections as we get into the analyses.

concerning an inmate's reasonable accommodation(s) is maintained" in their records. 103 DOC 408.05.

For requests related to medical needs, such as not climbing stairs, the ADA coordinator almost always consulted with medical staff before providing or denying the accommodation in writing. While the DOC defendants ordinarily deferred to a medical professional's judgment about what inmates needed, there were limits built into the regulations. Before implementing a requested accommodation, the DOC defendants, ever mindful of their overarching responsibility to maintain order and security within the prison confines, weighed risks including ensuring accommodations did not appear to give unfair preferential treatment to any particular inmate. See 103 DOC 408.07(8).

The accommodation process mattered to Snell because of the prison layout. MCI-Concord has two libraries: the general library on the first floor, and, as mentioned, the law library on the second floor. The latter housed several Lexis Nexis terminals and typewriters for inmate use. The general library on the first floor also had the Terminal (which, recall, includes a typewriter), but DOC defendants installed that station as an accommodation for inmates with documented medical restrictions which hampered their ability to reach the second floor.[7] With few exceptions, even

---

[7] MCI-Concord did not have an elevator that could reach the second-floor law library.

inmates with medical restrictions other than a no-stairs restriction did not have (or should not have had) an accommodation to access the Terminal according to prison rules.[8] By prison formality, the librarian (who oversaw both the first floor and second-floor libraries) was charged with verifying an inmate's documented accommodation before permitting use of the Terminal. Without the appropriate accommodation, according to prison rules, the inmate should not have been allowed use of the Terminal.

### An Inmate's Litigious Medical History

Soon after arriving at MCI-Concord, Snell's persistent health problems caused him to complain about having to climb stairs to get to various areas within the prison, including the law library. He sought (but did not get) a reasonable accommodation from prison officials to use the first-floor Terminal.[9] The denial baffled Snell because when he was housed at a prior facility, he had been given an indefinite medical restriction for bottom tier housing (meaning he could reside in rooms on the first floor). The authorizing doctor reasoned Snell needed a bottom tier

---

[8] For example, inmates could receive an accommodation to use the first-floor Terminal if they could not be in crowded spaces due to medical conditions like Post-Traumatic Stress Disorder.

[9] Notwithstanding his request, Snell, in fact, worked in the second-floor law library as a clerk for almost a year, from October 12, 2011, until October 2, 2012, during which time he successfully used the steps. A disciplinary infraction, unrelated to any appellate gripes, caused Snell to lose this position.

allowance because of his trouble negotiating stairs. From Snell's vantage, an indefinite bottom tier restriction and a no-stairs restriction were the same. However, DOC defendants clarified (in a deposition for this suit) that even prisoners with bottom tier restrictions ordinarily had to scale stairs; only prisoners with specific no-stairs restrictions could avoid the climb.

Of import here, Snell maintains DOC defendants, specifically MCI-Concord's ADA coordinator, did in fact grant him a reasonable accommodation to use the first-floor Terminal at some point prior to July 2013 because of his problems climbing stairs. However, Snell has never produced any documentation to verify that he ever had such an accommodation.[10] The DOC defendants say that's because in the timeframe pertinent to this litigation, he didn't.

Stair mobility issues aside, Snell had other troubles. Various maladies, aches, and pains brought Snell to Dr. Ruze, his prison physician, up to fifteen times a year. By her thinking, Snell had obesity, a condition which she deemed a primary cause of his degenerative joint disease and likely a contributor to his hypertension and respiratory problems including sleep apnea. In Dr. Ruze's medical opinion, one with which Snell emphatically

---

[10] Snell alleges that he could not easily sort through his 140+ boxes of legal materials (apparently, the boxes were changed, or their labels were destroyed). Snell nowhere contends, however, that the DOC defendants mishandled their own records, lost the accommodation form, failed to produce it in discovery, or that he even had such a form.

disagreed, Snell's degenerative joint disease did not substantially limit his ability to stand, to ambulate, or, importantly here, to climb stairs.[11] She even opined that stair climbing would strengthen Snell's knees, aid him in weight loss, and improve some of his other ailments.

No matter the disagreement over stair ambulation, Dr. Ruze and other medical personnel at MCI-Concord did not ignore Snell's medical needs; far from it. From 2010 to 2017, Snell, among other medical treatments, had x-rays of his knees and was referred to specialists for his orthopedic problems. By way of medical aids, prison medical personnel provided Snell with knee sleeves, anti-embolism stockings, back braces, medication for leg swelling, and the aforementioned cane. He was also afforded bottom bunk, in addition to bottom tier, restrictions, and given light work status. Despite all of the medical attention Snell received in those seven years, no medical or correctional personnel ever deemed a no-stairs restriction appropriate.

It was only in late 2018, about one year after Dr. Ruze had departed her MCI-Concord prison job, that a doctor provided

---

[11] Dr. Ruze stuck to this belief. In 2014, Snell requested an elevator restriction that would permit him to take the elevator rather than the stairs to a second-floor meeting for veterans (in an area unconnected to the second-floor library site). Dr. Ruze denied the request, telling Snell that he could negotiate one or two flights of stairs on a weekly basis if he wanted to attend the meeting.

Snell with his long-sought no-stairs restriction.  Dr. Churchville -- Dr. Ruze's replacement -- examined Snell twice in early October, and found him, at that time, walking slowly with visibly deformed knees, relying on his cane for support.  Reporting eight-out-of-ten knee pain on November 7, 2018, Snell again requested a no-stairs restriction.  On November 8, 2018, Dr. Churchville acceded, reasoning that Snell "was having more pain in his knee, [and] that stair climbing would aggravate that" pain.  That same day prison officials transferred Snell to MCI-Shirley, a medium-security and accessible facility where he could readily get to the law library and more easily avail himself of other prison programs.  Snell remained there as of oral argument.

### Inching His Way to This Litigation

We backtrack further to explain how Snell got to our court.  From July 2013 to October 2015, Snell used the first-floor Terminal near daily despite not having a no-stairs restriction or documented proof of an appropriate accommodation.  Apparently, Snell told the librarian, who started working at MCI-Concord in September 2013,[12] that he had an indefinite lower tier or no-stairs restriction.  It seems the librarian never checked the story out.  Additionally, since virtually no other inmates used the Terminal

_____

[12]   The record does not make clear who oversaw the library before September 2013, but the librarian key to this dispute worked at MCI-Concord at least through February 2019 when his deposition was taken.

- 12 -

and because Snell was on it so frequently, the librarian assumed Snell must have had an appropriate medical accommodation permitting him to conduct legal research on the first floor. At his deposition, Snell said he stopped using the second-floor law library most likely because of the pain in his knees from "having to climb up and down the stairs." For over two years no one ever challenged his presence at the first-floor Terminal, and, as mentioned earlier, Snell believed the DOC defendants had granted him permission to use it because of his ambulatory challenges.

In August 2015, the prison librarian went on vacation. While he was away, the Lexis terminals throughout the facility temporarily shuttered. Also, with the librarian gone, Snell claimed he could not get to the typewriter (the librarian was the one who provided it to inmates). Claiming he had no access to needed legal resources, Snell filed a grievance with DOC defendants (citing his disability). A prison official (not one of the DOC defendants) promptly resolved Snell's grievance but we'll provide more details on how it got addressed later.

Then, on October 9, 2015, Snell, apparently disturbed by some new issue concerning the amount of time he was being allowed to spend at the Terminal, submitted a new grievance seeking restoration of meaningful access to research time.[13] In it, Snell

---

[13] Inmates could request additional time to use library resources, but Snell's grievance complained of a "wholesale"

- 13 -

describes his physical disabilities, including his "difficulty in climbing stairs," and the accommodations he claims were granted him, including permission to use the first-floor Terminal because of them. The new time constraint he says was an arbitrary limitation which interfered with his "constitutionally mandated adequate, effective and meaningful court access," and amounted to a revocation of a reasonable accommodation previously afforded him by the DOC defendants.

Ten days later, the DOC defendants denied Snell's grievance regarding extra time, but they also noted that they were "unaware of an ADA [accommodation] granted to [Snell]," as Snell had described it, and added they "would be happy to review [Snell's] situation if [Snell] can provide the necessary documentation" to use the first-floor Terminal. Snell apparently did not. On October 29, 2015, the DOC defendants formally ended Snell's access to the Terminal. Thereafter, they denied Snell's string of grievances and appeals through the end of 2015 and into 2016.

---

denial of "added legal / meaningful court access" because MCI-Concord's policy apparently differed from other medium-security facilities, which, according to Snell, offered more legal research time to inmates. There is nothing in the record, other than this October 9, 2015 grievance, reflecting any attempt by Snell to request additional research time, and his briefs do not discuss the matter beyond this specific grievance.

**Traipsing Away from the Prison Administrative Process**

With his access to the Terminal blocked by administrative determinations, Snell turned outward for assistance. On June 22, 2016, Prison Legal Services, a not-for-profit Massachusetts organization, got involved, sending the DOC defendants a letter demanding they resume Snell's reasonable accommodation (the Terminal) given his disability and what they believed to be an indefinite no-stairs medical restriction from 1998. The DOC defendants promptly replied, reiterating the absence of such a restriction or the presence of any other indicator in Snell's medical record warranting such an accommodation. They further expressed they had consulted with Dr. Ruze who reported Snell should not have difficulty navigating stairs, especially with the use of a cane.

Also on June 23, Dr. Ruze entered in Snell's medical file what she characterized as an "administration note" to update and to renew Snell's expiring medical restrictions (e.g., bottom tier, bottom bunk, light work status). She did this even though she did not examine him on that day. In her note, Dr. Ruze observed, based on her many interactions with Snell, that he was "ambulating well with a cane, could negotiate stairs, needs to move slowly, and has good balance." Again, she withheld the no-stairs restriction.

On August 9, 2016, Snell filed a pro se complaint challenging, at its core, the termination of his access to the first-floor Terminal. The complaint was later amended after court-appointed counsel entered the scene.[14] Eventually, all defendants moved for summary judgment and, after taking the matter under advisement, the district court ruled in favor of the defendants. Snell timely appealed and here we are.

## Discussion

To repeat, Snell's legal fight clearly centers around his loss of access to the first-floor Terminal, and he advances several arguments here as to why the district court erred by granting summary judgment to the defendants. First, Snell contends that contrary to the district court's preliminary determination, his appeals for injunctive and declaratory relief are not moot. Second, Snell argues the DOC defendants and Dr. Ruze retaliated against him in violation of Title V of the ADA (42 U.S.C. § 12203) essentially because of his proclivity for filing lawsuits and grievances. Third, Snell alleges that precluding him from using

---

[14] The seven-count amended complaint alleged violation of the Eighth Amendment (Count I); violation of the Fourteenth Amendment (Count II); violation of the Fifth Amendment (Count III); violation of art. 114 of the Massachusetts Declaration of Rights (Count IV); violation of the ADA's anti-retaliation provision, 42 U.S.C. § 12203 (Count VI); and two claims solely against the DOC defendants for violations of Title II of the ADA, 42 U.S.C. §§ 12132, 12203, and Rehabilitation Act, 29 U.S.C § 794 (Counts V and VII). As noted earlier, Snell only challenges the grant of summary judgment on some claims.

the Terminal was cruel and unusual punishment in violation of the Eighth Amendment because the defendants, knowing stair climbing aggravated Snell's maladies, made him do it anyway if he wished to exercise his right to use the law library. Fourth, Snell claims the DOC defendants discriminated against him on account of his disability by withholding a reasonable accommodation in violation of Title II of the ADA (42 U.S.C. § 12132), the Rehabilitation Act of 1973 (29 U.S.C. § 794), and art. 114 of the Massachusetts Declaration of Rights (he does not appeal summary judgment against Dr. Ruze on this count).

The DOC defendants say the district court got it just right and appropriately denied Snell the relief he sought. They argue here, as they did below, that they never discriminated or retaliated against Snell -- anything but. Rather, they "reasonably relied upon the [then extant] clinical judgment of Dr. Ruze" and others in determining Snell could make his way to the second-floor law library. Dr. Ruze, for her part, says she provided medically adequate care, was never indifferent to Snell's needs, and never retaliated against him. We will first take up Snell's mootness claims before addressing each of Snell's remaining challenges.

**A. Whether Snell's Appeals Matter Anymore (Mootness)**

Delays within the legal system sometimes result in the resolution of a plaintiff's injuries without courts having to be significantly involved. In such circumstances, we say the

plaintiff's arguments are moot. See Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 160-61 (2016); Murphy v. Hunt, 455 U.S. 478, 481 (1982) (appeal becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.") (citation omitted). The district court concluded that Snell's transfer to the MCI-Shirley facility mooted his claims for injunctive and declaratory relief because Snell no longer needed a reasonable accommodation to access legal research materials and the defendants no longer required him to climb stairs. Snell thinks the district court erred because the harms he suffered while at MCI-Concord could happen again in the future, causing him once again to be transferred to another non-accessible prison where, without a current no-stairs restriction, he will be forced to climb stairs.

Because mootness touches upon jurisdictional issues (i.e., whether we can even hear the merits), we address it before his substantive claims, see Manguriu v. Lynch, 794 F.3d 119, 121 (1st Cir. 2015), and we review the district court's decision upon a clean slate, see Méndez-Soto v. Rodríguez, 448 F.3d 12, 14-15 (1st Cir. 2006).

An inmate generally loses the right to challenge "prison conditions or policies" at a particular facility when he transfers or leaves that prison because his complaints would no longer have any substantial impact on his life. Ford v. Bender, 768 F.3d 15,

29 (1st Cir. 2014) (citing Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007) ("[C]ourts, including our own, have held that the transfer of an inmate from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief, even if a claim for money damages survives.")). Here, once prison officials transferred Snell to MCI-Shirley, an accessible facility which made available to Snell, without impediment, appropriate prison legal resources, Snell could no longer allege a continuing injury remediable by injunctive or declaratory relief. See id.

However, there is a way for inmates to keep their declaratory and injunctive relief claims alive after they leave the prison in which the alleged harm occurred. If an inmate can show the challenged policies are "capable of repetition, yet evading review," then he can escape mootness. Ford, 768 F.3d at 30. The exception applies where: (1) the challenged action did not last long enough for the parties to litigate the harm before it ended; and (2) there is a reasonable expectation that the complaining party will endure the same allegedly harmful action at some point in the future. See Barr v. Galvin, 626 F.3d 99, 105 (1st Cir. 2010) (quoting FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 462 (2007)).

We assume Snell's circumstances satisfy the first prong and proceed to the second. In support thereof, Snell points to systemic imperfections in the prison medical review process for updating and renewing medical restrictions, and to his many battles with DOC defendants in pursuit of a no-stairs restriction.[15] Hammering the point, Snell tells us his no-stairs restriction from Dr. Churchville expired in November 2019 without being renewed. With this combination of concerns, Snell fears DOC defendants will transfer him out of MCI-Shirley, a place where the absence of the restriction does not affect his health.

The problem with Snell's argument is that he never references evidence of problems so severe as would amount to a systemically dysfunctional review scheme. Simply because the medical review process, at times, has glitches, and because Snell's no-stairs restriction has expired, does not mean Snell would not, going forward, receive all appropriate restrictions and accommodations if placed in a non-accessible facility. This is so particularly given the documented degenerative changes to his physical health, which the DOC defendants have acknowledged and addressed. Further, Snell has remained at MCI-Shirley since November 2018 and any uncertainty about how Snell might be later medically evaluated or later housed does not suggest a reasonable

---

[15] Snell often had his restrictions renewed annually, but the renewal process was far from perfect, let alone automatic.

- 20 -

likelihood of repetition. See Hunt, 455 U.S. at 482 ("[M]ere physical or theoretical possibility" of reoccurrence are not enough and "[r]ather, . . . there must be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will" happen again to the "same complain[ant]") (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam)); see also Ford, 768 F.3d at 30; Manguriu, 794 F.3d at 121 (assessing agency actions outside record when analyzing mootness).

As for Dr. Ruze, she no longer works as a contractor for the Massachusetts Department of Correction and therefore has no further medical responsibility for Snell; injunctive and declaratory relief aimed at her would be of no avail. See, e.g., ACLU of Mass. v. U.S. Conf. of Catholic Bishops, 705 F.3d 44, 53 (1st Cir. 2013) (once contract expired, nothing to enjoin).

Accordingly, we affirm the district court's decision to declare moot the claims for injunctive and declaratory relief and turn now to Snell's remaining claims for damages against the defendants, claims which survive because his transfer out of MCI-Concord does not erase any injury he may have suffered while he was there. See Ford, 768 F.3d at 29 (quoting Incumaa, 507 F.3d at 287).

**B. Standard of Review for Summary Judgment Claims**

Appellants who lose at summary judgment get the benefit of what we call de novo review, which is where we examine the

entire record afresh to determine whether the law required the moving party -- here the defendants -- to win. See Nunes, 766 F.3d at 142. We will agree the defendants should have won if "no genuine dispute as to any material fact" exists in the record, id. (quoting Fed. R. Civ. Pro. 56(a)), and the movants are entitled to judgment as a matter of law, see Mason v. Telefunken Semiconductors Am., LLC, 797 F.3d 33, 37-38 (1st Cir. 2015). If the non-moving party (Snell) can point to record evidence allowing a reasonable jury to return a verdict in his favor, then we would say there is a genuine dispute of material fact and the district court erroneously granted summary judgment. See Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015); see also Enica v. Principi, 544 F.3d 328, 336 (1st Cir. 2008). That evidence, however, cannot "rely[] on improbable inferences, conclusory allegations, or rank speculation." Enica, 544 F.3d at 336 (quoting Ingram v. Brink's, Inc., 414 F.3d 222, 228-29 (1st Cir. 2005)).

### C. Retaliation on Account of Litigation

Snell leans on Title V of the ADA by alleging claims which boil down to this: the DOC defendants and Dr. Ruze retaliatorily conspired to keep Snell from the first-floor

Terminal because, he believes, his litigious character irked them.[16]

We assess whether defendants illegally retaliated against plaintiffs through a familiar burden-shifting exercise. See D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03 (1973)). Snell must present evidence that: (1) he engaged in conduct protected by the ADA, such as complaining about a lack of a reasonable accommodation; (2) the defendants subjected him to some adverse action; and (3) there was a causal connection between the protected conduct and the adverse action. Id. "An adverse action is one that might well dissuade a reasonable person from making or supporting a charge of discrimination." Id. If Snell demonstrates evidence of all three (what lawyers call a "prima facie" case), then the burden shifts to the defendants to provide a "legitimate non-retaliatory explanation for the adverse action." Id. at 42. If the defendants succeed, the story does not end there. Once more the burden shifts back to Snell to establish sufficient facts such that a reasonable juror could believe the defendants' explanations were pretextual, meaning the defendants

---

[16] Title V of the ADA makes such retaliation illegal: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

were "motivated by a retaliatory animus." Id. Although we step cautiously when considering summary judgment motions involving issues of motive and intent, such as Snell's retaliation allegation, see Oliver v. Digit. Equip. Corp., 846 F.2d 103, 109 (1st Cir. 1988), the nonmoving party must proffer more than "conclusory allegations, improbable inferences, and unsupported speculation" for his claims to survive, Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).[17] With these principles in mind, we turn to Snell's claims against each defendant.

By October of 2015, Snell had lodged a number of administrative complaints about stair climbing, and he had turned to state court litigation at least once.[18] But the October 9, 2015

---

[17] Additionally, in suits brought by inmates, we are mindful that some of our sister courts have been at times wary of retaliatory claims because prisoners file them (or threaten to file them) frequently, as Snell himself admits to having done. See Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003); Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). Because of this real world reality, these courts have approached such claims with "particular care" since, as they persuasively reason, "virtually any adverse action taken against a prisoner by a prison official -- even those otherwise not rising to the level of a constitutional violation -- can be characterized as a constitutionally proscribed retaliatory act." Goord, 320 F.3d at 352 (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)). Whether this extra caution is warranted is not a fray we need to enter in resolving Snell's claims.

[18] It is unclear from the record but in May 2013, Snell sued prison officials in Massachusetts Superior Court seeking

- 24 -

grievance newly bemoaning unreasonable Terminal time constraints and reiterating his stair climbing deficits appear to have garnered greater scrutiny. After considering Snell's requests, the DOC defendants denied the grievance and thereafter prohibited Snell from using the first-floor legal resources after one official found him at the Terminal on October 29, 2015.[19] To Snell, the DOC defendants' swift action was by no means a coincidence; it was retaliation to "keep [him] from getting access to the courts."

As for Dr. Ruze, Snell claims her participation in the retaliatory conspiracy occurred when she wrote the June 23, 2016 administrative note wherein she reiterated her opinion that Snell had no medical reason to stay on flat ground. Dr. Ruze did so, says Snell, without medically reevaluating him, and on the same day prison officials consulted her after receiving the Prison Legal Services' demand letter asserting Snell's ADA rights. We first address the allegations against Dr. Ruze before moving on to the DOC defendants.

---

"reinstatement of his bottom-bunk placement" (which for some reason had been taken away) "and judicial relief to prevent," as he alleged, "further damage to [his] knees caused by being forced to climb stairs." In March 2014, the court dismissed the case as moot without prejudice because prison officials had returned Snell to a bottom bunk.

[19] Joann Lynds, the director of treatment who was supervised by the ADA coordinator, came upon Snell at the Terminal. She could not recall how she found him there but she testified at deposition that she had never seen him there before.

### i. Dr. Ruze

For the first prong of the test -- did Snell engage in protected ADA conduct -- we conclude that Snell's numerous grievances concerning losing access to the first-floor Terminal can reasonably be viewed as protected conduct. See Esposito, 675 F.3d at 41.

However, Snell can make it no further. Turning to the second step -- whether Dr. Ruze subjected Snell to any adverse action -- our scour of the record finds no evidence demonstrating she did. The June 23, 2016 note Snell points to as proof of an adverse action makes no mention whatsoever of the Terminal; it merely repeats Dr. Ruze's longstanding medical opinion concerning Snell's ability to climb stairs. In fact, the myriad administrative complaints concerning Snell's first-floor woes (both before and after June 23, 2016) never mention Dr. Ruze as acting adversely towards him. Rather, they focused almost solely on Snell's understanding of what his 1998 "indefinite" bottom tier restriction afforded him. Nor has Snell produced evidence of any specific grievances he may have filed which voiced dissatisfaction with Dr. Ruze's medical treatment (even as he insists he must have submitted them) or which complained to Dr. Ruze about accessing the Terminal. And although (as discussed more below) the DOC defendants' decision to shut off Snell's first-floor Terminal might reasonably be considered adverse vis-à-vis the responsible

decision makers, Snell's opening brief concedes Dr. Ruze had no say in that decision. Her job was to provide medical restrictions and recommendations based on her best medical judgment, not to adjudicate what should be considered a reasonable accommodation, a determination which the DOC defendants could have provided to Snell with or without Dr. Ruze's medical input. As such, Snell has not, as our case law requires, advanced evidence to create a triable issue of fact regarding whether Dr. Ruze's note was an adverse action which would "dissuade a reasonable person from making or supporting a charge of discrimination." Esposito, 675 F.3d at 41.[20]

Even if Snell managed to get past prong two, his argument falters at step three because there is no evidence Snell's grievances caused Dr. Ruze to act adversely against Snell. Snell counters that there is indeed such evidence of causation, and he points to the timing of Dr. Ruze's June 23 note as such proof. That Dr. Ruze provided the note to the DOC defendants on the same day they provided Prison Legal Services with a justification for denying Snell access to the first-floor Terminal and that Dr. Ruze provided the note after the DOC defendants asked her about Snell's medical history is, to Snell, significant. It demonstrates, says

---

[20] As a kicker to the weakness of Snell's assertions, he clearly was not dissuaded or particularly bothered by Dr. Ruze's note. He continued to file grievances and to seek Dr. Ruze's medical advice as a cordial patient.

Snell, that Dr. Ruze had a hand in punishing him for asserting his ADA rights (even if, as he conceded, she could not control the initial deprivation). While it is correct that temporal proximity between a protected action (such as filing grievances) and the adverse action (terminating Snell's use of the Terminal) can, at times, demonstrate causation, see Esposito, 675 F.3d at 42 (quoting Carreras v. Sajo, García & Partners, 596 F.3d 25, 38 (1st Cir. 2010)), the proximity fails to do so in this instance. The DOC defendants' revocation of Snell's first-floor Terminal usage occurred some nine months before Dr. Ruze notated her June 23 stair climbing opinion making any causal connection too attenuated.

But not so fast. Snell also argues causation is established by the combination of two events on June 23, 2016, before Dr. Ruze filed the administrative note later in the day: (1) Dr. Ruze and the DOC defendants' discussion of Snell's law library usage; and (2) Dr. Ruze's failure to reexamine Snell. No reasonable juror could find either action separately or in concert suspect. Dr. Ruze's administrative note articulated her (and other medical providers') long-held medical opinion that Snell did not require a no-stairs restriction -- an opinion clearly untethered to Snell's legal research preferences. As for entry of her note without a same-day examination, the record makes pellucid that Dr. Ruze was exceedingly familiar with Snell, considering the multiple times she treated him in 2016 and the abundance of times she saw

him over the preceding years.  As mentioned earlier, she opined stairs would improve, not harm, Snell's health and she retained this medical opinion way past the entry of her June 23, 2016 note. When treating Snell in April 2017, she still maintained he could "walk quickly" with or without a cane, that he had 5/5 strength in his lower extremities, and that his health would decline if he stopped walking stairs.  The record thus shows, beyond dispute, that Dr. Ruze's consistent medical opinion, not Snell's protected conduct or her discussion with the DOC defendants about that conduct, caused her to pen the June 23, 2016 note.  Cf. Collazo-Rosado v. Univ. of P. R., 765 F.3d 86, 93 (1st Cir. 2014) (consistent behavior by defendants undercut plaintiff's argument that defendants' legitimate explanations for adverse employment action were pretextual).  Snell's speculative arguments to the contrary are not enough to survive summary judgment.  See Enica, 544 F.3d at 336.

### ii. The DOC Defendants

So we move along to Snell's retaliation claims against the DOC defendants.  Reading the facts in the light most favorable to Snell, we will assume he has made out his prima facie case of retaliation.  See Esposito, 675 F.3d at 41.  We can also assume the DOC defendants countered with a legitimate, non-discriminatory explanation for keeping Snell away from the first-floor Terminal: they claim to have done so only after they became explicitly aware

Snell was using it and after they confirmed Snell had no accommodation due to a medical restriction warranting its use. See id.; Collazo-Rosado, 765 F.3d at 93 (1st Cir. 2014) (proceeding to the simplest way to resolve a retaliation lawsuit). What we are left to decide is whether, as Snell contends, the DOC defendants' proffered explanations hold up under scrutiny or whether record evidence suggests those explanations are pretext to cover up their true discriminatory intent.

"[T]here is no mechanical formula for finding pretext" and it is thus a fact-intensive inquiry to uncover the DOC defendants' true motives. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 116 (1st Cir. 2013) (quoting Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003)). One way for a plaintiff to survive summary judgment is by showing pretext through "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [DOC defendants'] proffered legitimate reasons for [their] action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [DOC defendants] did not act for the asserted non-discriminatory reasons." Adamson v. Walgreens Co., 750 F.3d 73, 79 (1st Cir. 2014) (quoting Gómez-González v. Rural Opportunities Inc., 626 F.3d 654, 662-63 (1st Cir. 2010)). If the undisputed record evidence is insufficient to demonstrate pretext, then Snell

will be unable to meet his final burden. See Kelley, 707 F.3d at 116.

Snell asserts that the DOC defendants' proffered explanation for shutting down his access to the first-floor Terminal was inconsistent or contradictory with the actual record because: (1) they knew about and sanctioned his use of the Terminal between 2013 and 2015; and (2) they kept him away from those legal resources for reasons other than his lack of a no-stairs restriction.

**a. Whether the DOC Defendants Knew about or Sanctioned Snell's Use of the Terminal**

Snell points to evidence which he says supports his contention that he had permission to use the Terminal. Snell testified at his deposition that the DOC defendants, specifically the ADA coordinator, granted him a reasonable accommodation to use the first-floor Terminal between July 2013 and October 2015 (though they contest having done so). Remember also that Snell says the DOC defendants knew about his use of the Terminal. If either were true, Snell might well demonstrate the existence of a genuine disputed material fact as to whether the DOC defendants' proffered legitimate explanation for taking away Snell's access -- that they only found out he was using the Terminal following the October 9, 2015 grievance -- was pretextual.

But the analysis is not so simple. Although our case law recognizes that testimonial evidence can, at times, be sufficient to raise a genuine issue of material fact, we have also repeatedly indicated that conclusory statements without support in the record are not enough to survive summary judgment.[21] See Velázquez-García v. Horizon Lines of P.R., Inc., 473 F.3d 11, 18 (1st Cir. 2007) (holding that self-serving testimony is sufficient to survive summary judgment so long as "the nonmovant's deposition testimony sets forth specific facts, within his personal knowledge, that, if proven, would affect the outcome of the trial"); Medina-Muñoz, 896 F.2d at 8 ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").

With that framing in mind, we take a deeper record dive to see what contentions find support. First, we assess whether there is evidence that the DOC defendants granted Snell a reasonable accommodation. Next, we tackle whether there is record

---

[21] Snell also makes a passing allegation that he received the accommodation following a 2013 state court lawsuit against an MCI-Concord superintendent in which he challenged losing his bottom bunk status. See supra note 18. In that suit, at least according to the record before us, Snell never specifically demanded an accommodation to access the first-floor Terminal, so it was never addressed there.

support for Snell's assertion that they otherwise knew or sanctioned his use of the Terminal from July 2013 to October 2015.

## 1. Whether the DOC Defendants Granted Snell a Reasonable Accommodation

As mentioned earlier, there is no written documentation of any reasonable accommodation having been granted to Snell, despite the regulations requiring the DOC defendants to keep such paperwork. Moreover, Snell makes no claim that the DOC defendants violated their regulations or lost apt paperwork.[22] Therefore, without such documentation, we will take Snell's argument to mean that the DOC defendants granted Snell's claimed reasonable accommodation in some oral off-the-books method. The DOC defendants, including the ADA coordinator, repeatedly testified Snell was never granted a reasonable accommodation for first-floor Terminal use. Had they done so, they would have used formal channels to process and to correspond about such issues. Snell does not dispute this testimony except to repeat the same refrain -- "DOC authorities permitted Mr. Snell to use the . . . [Terminal]." The only further detail he puts forward is that the ADA coordinator sanctioned his use of the legal resources because of his "orthopedic conditions and difficulty climbing stairs."

---

[22] The DOC defendants kept an electronic system that supposedly tracked all accommodations, and which did not show any accommodation for Snell, but one DOC defendant testified to documented accommodations existing off the electronic system.

According to the DOC defendants, staff did not grant reasonable accommodations temporarily or orally, even when it was obvious the inmate required one. For example, if an inmate in a wheelchair asked the librarian to use the first-floor Terminal, he could not do so without proof of an accommodation, notwithstanding the self-evident fact that the inmate could not climb stairs. The process to approve an accommodation for an inmate with "obvious physical impairments," a group to which Snell claimed he belonged, did not have to be lengthy. The librarian could call the ADA coordinator who could approve the accommodation without checking on a medical restriction, if the impairment was glaringly discernable. Or, if the inability to stair climb was less conspicuous (such as an inmate using a cane), the ADA coordinator could check quickly with medical staff to see if the inmate had any stair climbing medical restriction. If so, the ADA coordinator would formalize the accommodation by memorializing it in writing. Whatever the scenario, there would always be paperwork.

We note that although Snell says the ADA coordinator granted him permission to use the Terminal, he puts no other meat on the bones such as when or where the conversation occurred or the context in which it arose or was supposedly granted. Without more, we find Snell's statement amounts to a bald, conclusory allegation insufficient to create a genuine issue of material fact as to whether the DOC defendants let him use the Terminal. Thus,

the decision to discontinue Snell's improper use of the Terminal cannot reasonably be viewed as evidence of pretext.

**2. Whether the DOC Defendants Knew about or Permitted Snell's Terminal Use**

Even if Snell had no formal reasonable accommodation, he could demonstrate pretext if he raised a genuine issue of material fact that the DOC defendants otherwise knew about or permitted his use of the Terminal before Snell filed the October 2015 grievance and before they stopped letting him access the first-floor resources. As Snell tells it, two scenarios in the record support his pretext claims in this manner. First, the librarian allowed Snell to use the Terminal in full view without reprimand. And, second, Snell points to the grievance he filed in August 2015 (the grievance resulting from the vacationing librarian leaving Snell high and dry), in which he pleaded for restored access to legal resources including a typewriter and a Lexis terminal. Neither asserted fact gets him very far.

Aside from that which we've already rejected, Snell guides us to no other evidence disputing that it was the librarian, not the DOC defendants, who permitted him to use the Terminal without a proper medical restriction in violation of MCI-Concord's rules. The policy preventing the librarian free rein was in place by 2011, and Snell concedes that the librarian "understood that the" Terminal was "designated for handicap-accessible use" only.

- 35 -

The librarian, however, admitted that he nonetheless let inmates use the Terminal on a "[f]irst come, first serve" basis, apparently in violation of the DOC defendants' rules. He specifically believed that Snell could use the Terminal not because he checked with the DOC defendants, but because Snell was using the Terminal when the librarian started at MCI-Concord in September 2013 and because Snell showed up nearly every day to use it.

Moreover, nowhere in his opening or his reply brief does Snell describe or point to any evidence that the responsible DOC defendants saw him using the resources "in full view" until they found him there on October 29, 2015. By using the phrase "in full view," perhaps Snell wants us to conclude that the DOC defendants saw or should have seen him at the Terminal in the normal course of the prison day during his two-plus-year stint on the machine. But after thoroughly probing the record here, we have found no evidence to support that contention. And without more information in the record describing, for instance, what daily routine would have brought Snell into the view of the DOC defendants, the inference Snell asks us to draw amounts to speculation. That one prison librarian failed to do his job does not morph the DOC defendants' legitimate rationale into a contradiction evidencing pretext. See Enica, 544 F.3d at 336 (speculation not enough to survive summary judgment).

Second, as for the August 2015 grievance decrying his typewriter and Lexis deprivation, Snell claims it proves another prison official aside from the librarian (and one somehow involved in administrative processes) became aware of Snell's first-floor Terminal use and did not right then put an end to it.[23] However, pertinent here, Snell's August 2015 grievance, which the official handled, makes no specific mention of first-floor legal resources at all. Likewise, the official's five sentence response, which is typed on the same page below the grievance, makes no mention of first-floor equipment. But, Snell argues, because his grievance does note that he "possess[ed] an unspecified 'special medical needs restriction'" since 1998 (presumably his indefinite bottom tier restriction) given his "difficulty in climbing stairs," we should conclude the official (and, by extension, the DOC defendants) had to know his complaint was making reference to his loss of first-floor legal resources.

From the face of the document, we fail to see why we should. In responding to Snell's grievance, the official explained, without embellishment, how alternative staffing had been arranged to provide access to a typewriter (and other items) in the librarian's absence. As for the Lexis disrepair, the prison

---

[23] Although that official's name and position appear in the record, it is otherwise silent on what his particular duties and responsibilities would have been to interrupt Snell's Terminal usage, assuming he knew about it.

official wrote: "The issue with the Lexis computer system has been resolved. Be advised that every effort is made to restore the Lexis computer system in the event of malfunction." Other parts of the record make clear the entire system of Lexis terminals -- first and second-floor -- had been inoperable on the day Snell complained and had to be fixed. Therefore, contrary to what Snell contends, no evidence suggests the official's written resolution of Snell's grievance, standing alone, could be reasonably viewed as a grant of permission for him to use the first-floor Terminal due to his medical condition. Snell's rejoinder thus does not contradict the DOC defendant's repeated official position on his many stair-climbing grievances; they believed Snell, in 2015, could still negotiate the hike and they were not aware he was using the first-floor Terminal.[24] No contradictory evidence on this point advances Snell's pretext argument.

### b. Ulterior Motive Theory

Next, Snell attacks the second half of the DOC defendants' proffered legitimate explanation -- that they kept Snell from the first-floor Terminal because he lacked a no-stairs medical restriction that could have qualified him for the accommodation. Specifically, he urges that a reasonable jury could

---

[24] Even after Snell filed the August grievance, it appears the DOC defendants renewed their invitation for him to apply for a reasonable accommodation to use the first-floor Terminal, but he did not do so.

return a retaliation verdict in his favor due to circumstantial evidence proving discriminatory animus. See Enica, 544 F.3d at 343 ("[C]ircumstantial evidence may certainly establish discriminatory motive"). Snell points out that the DOC defendants transferred him to MCI-Shirley, an accessible facility, on November 8, 2018, the same day he received the no-stairs restriction from Dr. Churchville. But Snell has not developed how or why the DOC defendants' decision to transfer Snell once Dr. Churchville determined Snell's condition had worsened evidences pretext. See Charles v. Rice, 28 F.3d 1312, 1319 (1st Cir. 1994) (empowering us to ignore perfunctory arguments).

Aside from Snell's lack of development, we note the decision came almost three years after the deprivation of Snell's access to the Terminal. Additionally, the DOC defendants, just as they had earlier done with Dr. Ruze, followed prison procedures by deferring to Dr. Churchville's updated November 2018 medical opinion that Snell, upon further examination, should no longer climb stairs and should have first-floor housing. That the DOC defendants responded to the updated 2018 medical recommendation by finding Snell an accessible prison without stairs, instead of simply letting him use the Terminal, says nothing about the DOC defendants' motivations for their 2015 ADA response. But see Echevarría v. Astrazeneca Pharm., LP, 856 F.3d 119, 136 (1st Cir. 2017) (stating the "rock-solid premise that [a defendant's]

inadequately explained material deviation from standard procedure can establish a genuine dispute of material fact as to whether the [defendant's] stated justifications are pretextual" (citing Acevedo-Parilla v. Novartis Ex-Lax, Inc., 696 F.3d. 128, 142-43 (1st Cir. 2012))).

Snell's final attempt to show the DOC defendants' reasoning for the adverse action against him was pretextual complains that the DOC defendants singled out Snell for punishment because they told the librarian specifically not to let him (and no one else) use the first-floor Terminal. True, the DOC defendants did tell the librarian to keep Snell away from that station. But such is not the end of the story. Although the order to enforce the "Handicapped Only" nature of the first-floor Terminal may, on the surface, appear to affect only Snell, he has pointed to no supporting evidence showing other inmates were allowed to use the Terminal without an appropriate medical restriction or without an approved accommodation once the librarian was reined in. In fact, according to the librarian, no other inmate has used the first-floor Terminal since the DOC defendants reminded him to enforce prison regulations. On this record, we cannot say that the DOC defendants acted with pretext when they, in complete accord with prison regulations and procedures and coupled with their prior denials of Snell's grievances, instructed the librarian to follow the rules and to

keep an inmate without a qualifying restriction from using the Terminal. See id. The DOC defendants never provided inconsistent or contradictory reasoning about official first-floor Terminal protocol. See id. (dismissing defendant's claim of pretext when she did not raise any facts showing defendants' explanations were "contradictory, incoherent, implausible, or inconsistent," or that they were "'unworthy of credence'" (quoting Collazo-Rosado, 765 F.3d at 94)).[25] Snell's assertions to the contrary are mere "unsupported speculation" which cannot demonstrate the DOC defendants' legitimate explanations were pretextual. Coll, 50 F.3d at 1121 (quoting Medina–Muñoz, 896 F.2d at 8).

---

[25] Snell also argues that the temporal proximity between the deprivation (October 29, 2015) and his grievance (October 9, 2015) shows a causal connection necessary to prove his prima facie case. As stated, we need not engage with the prima facie case argument because we assumed Snell met his burden. However, even if Snell's brief implied that temporal proximity proves pretext, he would be mistaken. That there was a temporal proximity between Snell's grievance and the DOC defendants' action does not alone get him to his preferred destination. See Echevarría, 856 F.3d at 138 ("Although such close temporal proximity 'may suffice for a prima facie case of retaliation,' it 'does not[, standing alone,] satisfy [the] ultimate burden to establish that the true explanation for [plaintiff's] firing was retaliation for engaging in protected conduct.'" (first alteration in original) (quoting Carreras, 596 F.3d at 38)). And, as demonstrated, the DOC defendants' actions were an expected reaction by prison officials who learn about behavior that violates prison rules.

## D. Climbing the Cruel and Unusual Stairs to the Courthouse
## (Eighth Amendment)

The district court determined there was no triable issue of material fact that either the DOC defendants or Dr. Ruze subjected Snell to cruel and unusual punishment by withholding a no-stairs restriction and by discontinuing his reliance upon the first-floor Terminal. Snell disagrees, once more alleging the defendants' decisions caused harm to his health.

To succeed with an Eighth Amendment claim related to medical problems, Snell must satisfy two elements against the DOC defendants and Dr. Ruze. See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).[26] According to the first prong -- the objective one -- we must determine whether Snell had a "serious medical need[]" for which the defendants provided inadequate care. Id. at 104; see also Kosilek v. Spencer, 774 F.3d 63, 85 (1st Cir. 2014) ("To sustain a claim under the objective prong of the Eighth Amendment, [plaintiff] must show that she has a serious medical need for which she has received inadequate treatment.").[27] Under the second prong

---

[26] The Fourteenth Amendment's due process clause makes the Eighth Amendment apply to state actors. See Robinson v. California, 370 U.S. 660, 667 (1962). Title 42, United States Code, Section 1983 provides a private right of action for plaintiffs to litigate constitutional harms, including Eighth Amendment ones. See Parker, 935 F.3d at 14.

[27] Snell's opening and reply briefs insist that he is not complaining about the quality of care he received; rather, it is the denial of a reasonable accommodation for his inability to ascend stairs which undergirds his Eighth Amendment challenge.

-- the subjective one -- we must assess whether the DOC defendants and Dr. Ruze exhibited "deliberate indifference to [Snell's] serious medical need" when they shut him out from the first-floor Terminal.  Estelle, 429 U.S. at 105.  We also must keep in mind that not every harm equates to cruel and unusual punishment in violation of the Eighth Amendment.  See Kosilek, 774 F.3d at 83 (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  We take each prong in turn.

### i. Serious Medical Need

For the objective prong, the range of serious medical needs includes those which are either diagnosed by physicians or "'[are] so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Id. at 82 (quoting Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st

---

Because of the distinction, Snell argues that whether he received "inadequate medical care" is irrelevant for determining whether he suffered from a serious medical need sufficient to satisfy the objective prong of our Eighth Amendment test.  Snell, however, does not cite to any First Circuit precedent supporting his view that we can excise "inadequate medical care" from our analysis. In fact, in his opening brief, he relies on Kosilek to lay out the test for whether prison officials have violated an inmate's Eighth Amendment rights.  As just shown, Kosilek expressly requires "inadequate treatment" of a serious medical need to satisfy the objective prong, 774 F.3d at 85, and that is how we will analyze the claim, because withholding a reasonable accommodation might, in certain circumstances, constitute inadequate care.  To the extent Snell may be inviting us to follow other circuits, which lump inadequate care into the subjective prong of deliberate indifference, see, e.g., Callahan v. Poppell, 471 F.3d 1155, 1159 (10th Cir. 2006), Snell cannot thereby avoid a wholesale discussion of the topic.

Cir. 1990)). As for whether the defendants provided adequate care, prison officials are not required to render ideal care, let alone cater to an inmate's preferred healthcare regimen. See id. They simply must provide care at "a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." United States v. Derbes, 369 F.3d 579, 583 (1st Cir. 2004) (quoting United States v. DeCologero, 821 F.2d 39, 43 (1st Cir. 1987)). Moreover, "[t]he law is clear that where two alternative courses of medical treatment exist, and both alleviate negative effects within the boundaries of modern medicine, it is not the place of our court to 'second guess medical judgments'. . . ." Kosilek, 774 F.3d at 90 (quoting Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir. 1981)); see also Ruiz Rosa v. Rullán, 485 F.3d 150, 156 (1st Cir. 2007) (disagreement between two medical professionals regarding the proper course of treatment will generally be insufficient to establish an Eighth Amendment violation).

Even assuming Snell's various knee, back, and respiratory ailments were objectively serious to a layperson, let alone to a doctor, there is still no genuine issue of material fact that the defendants violated the Eighth Amendment by providing inadequate care, which, as Snell claims, "subject[ed] him to the pain and danger of being forced to climb stairs to reach the second-floor law library."

Focusing on Dr. Ruze for our objective prong analysis, the record indicates that her decision to withhold the no-stairs restriction scales along with the accepted medical touchstones of the time, see Kosilek, 774 F.3d at 90, especially considering she also provided Snell with a range of other therapies to alleviate his pains, including knee sleeves, bottom bunk restrictions, a cane for walking, and a back brace, among other treatments which the DOC defendants ensured Snell obtained.[28] Dr. Ira K. Evans, III, a physician expert retained by Dr. Ruze once Snell filed suit, as well as several other health professionals who evaluated Snell from 2010-2017, also opined Snell could have (and should have) walked stairs to improve his health. At the very least, Snell did not receive care far outside the scope of acceptable medical practice. See id. at 82; cf. Callahan v. Poppell, 471 F.3d 1155, 1159 (10th Cir. 2006) (no deliberate indifference where evidence "indicate[d] that the medical staff believed that the greater threat to [prisoner plaintiff] arose from his use of a wheelchair,

_____

[28] Because the DOC defendants deferred to Dr. Ruze's and other medical providers' judgments regarding inmates' proper medical care, see 103 DOC 408.07(7), we can analyze the adequacy of the care provided by all defendants by looking at Dr. Ruze's decisions, see Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008) ("The policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one.").

because continued use of the wheelchair would result in muscle atrophy and imperil his ability to walk.").

But wait, says Snell, Dr. Churchville and an expert retained by Snell for trial, Dr. Michael G. Kennedy, MD., C.C., F.R.G.S. (C), disagreed with Dr. Ruze, her expert, and the other medical professionals about Snell's proper medical treatment. And, in Snell's telling, the competing expert opinions create, at minimum, a genuine issue of material fact that he suffers from a serious medical need. No disputing Dr. Churchville provided a no-stairs restriction in November 2018, but, remember, this was three years after the DOC defendants stopped Snell's first-floor Terminal use and more than two years after Dr. Ruze's June 23, 2016 note confirming Snell could climb stairs. In addition to Dr. Churchville, Snell's expert, Dr. Kennedy, also thought Snell deserved a no-stairs restriction in October 2015 because he "should, at all cost, [have] avoid[ed] climbing up and down stairs" due to his problematic knees and back. But both events are inconsequential since we have already assumed Snell suffered a serious medical need in 2015. Our task, then, is to scrutinize the record to see if evidence shows Snell received inadequate care during the relevant time frame.

To remind, where medical experts do not contend the care provided fell outside of the bounds of acceptable medical practice, disagreement among the experts over the proper course of care does

not help Snell.  See Kosilek, 774 F.3d at 90.  Although Snell's expert report summarized the various procedures and treatments Snell received over the years, it said nary a peep about whether, in his opinion and to a reasonable degree of medical certainty, the care provided to Snell fell below the proper standard of care. Same goes for Dr. Churchville who likewise during his deposition never claimed or hinted that the defendants provided Snell with inadequate care.  Both doctors are permitted to have a differing medical opinion than Dr. Ruze and her expert regarding the health impact of stair climbing but such does not make for an Eighth Amendment violation.  See Ruiz-Rosa, 485 F.3d at 156 ("disagreement as to the appropriate course of [medical] treatment [is] insufficient" for an inmate "to prove a constitutional violation" of his Eighth Amendment rights).  As such, the record fails to show Snell received inadequate care to satisfy the objective prong.

### ii. Deliberate Indifference

For the sake of completeness though, we'll continue along the tiered levels by assuming there is a genuine issue of material fact regarding the objective prong and by turning to assess the subjective element.

Deliberate indifference appears when defendants had a "sufficiently culpable state of mind" by ignoring (or worsening) the inmate's serious medical need.  Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).  Deliberate

indifference is therefore more than negligence, or the "ordinary lack of due care for the prisoner's interests or safety," yet it need not be intentional harm. Id. at 835 (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). The defendants must have known of the risk of harm to the plaintiff and disregarded it. See Nunes, 766 F.3d at 142. Deliberate indifference consequently occupies a "narrow band of conduct" that is "so inadequate as to shock the conscience." Feeney v. Corr. Med. Servs. Inc., 464 F.3d 158, 162 (1st Cir. 2006) (citation omitted). Needless to say, if defendants acted reasonably in light of the inmate's serious medical need, including by refusing an accommodation for safety or institutional concerns, we will not decide they acted with deliberate indifference in violation of the Eighth Amendment, even if the defendants' actions resulted in an inmate's discomfort from trekking to the second-floor library. See Farmer, 511 U.S. at 844; Kosilek, 774 F.3d at 91-92 (reasoned choice of medical treatment among competing options rarely constitutes deliberate indifference); Callahan, 471 F.3d at 1160 (collecting cases explaining defendants have no right under the Eighth Amendment "to a particular course of treatment").

### a. Dr. Ruze

For the reasons stated above, Dr. Ruze crafted the strategy to handle Snell's ailments based on a reasoned medical decision, which makes it difficult, to say the least, for Snell to

show deliberate indifference, even though he contends that had he "had an actual medical need for a no-stairs restriction," it "would support an inference that Dr. Ruze acted with deliberate indifference" by continuing his no-stairs restriction in June 2016 "without examining or consulting" Snell. Dr. Ruze may not have provided Snell with the type of care he desired or (viewing the evidence in the light most favorable to Snell) he needed, but that does not ring of an Eighth Amendment violation. See Estelle, 429 U.S. at 105-06 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

### b. DOC Defendants

As for the DOC defendants, we similarly conclude that the record here yields no genuine issue of material fact which would support a finding of deliberate indifference. Although the DOC defendants could have independently granted Snell the accommodation he sought for first-floor Terminal access, see 103 DOC 408.07, they had no reason to expect Snell needed it given their justifiable reliance on the medical opinions of Dr. Ruze and other health care professionals who treated Snell, see Matthews v. Pa. Dept. of Corr., 613 F. App'x 163, 170 (3d Cir. 2015) ("[N]on-medical prison officials are generally justified in relying on the expertise and care of prison medical providers. Absent a reason to believe (or actual knowledge) that prison doctors or their

- 49 -

assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." (ellipsis in original) (internal citation and quotation marks omitted) (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004))).

Even putting aside their reasoned reliance on the opinions of medical professionals like Dr. Ruze, Snell had walked up and down stairs (even if with a cane in hand and even if with some difficulty)[29] in other parts of the prison throughout his confinement, denting Snell's argument that the DOC defendants callously disregarded the risk he would suffer a more severe injury without the accommodation. The DOC defendants, as the record reflects, thus reasonably believed Snell could traverse stairs to the second-floor law library without suffering serious or irreparable harm. See Kosilek, 774 F.3d at 92 (finding no deliberate indifference where decision fell "within the realm of reason and made in good faith") (quoting Battista v. Clarke, 645 F.3d 449, 454 (1st Cir. 2011)).

We thus affirm the grant of summary judgment on the Eighth Amendment claims. See Nunes, 766 F.3d at 142.

---

[29] Forget not his job in the second-floor law library from 2011 to 2012.

## E. Reasonably Accommodating a Love for Litigation

Relying upon the ADA, 42 U.S.C. § 12132, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and art. 114 of the Massachusetts Declaration of Rights,[30] Snell proclaims that the DOC defendants discriminated against him on account of his disability by denying him a reasonable accommodation to research legal matters through the Terminal.[31]  More specifically, Snell asserts we must find the DOC defendants to have violated the anti-discrimination laws if they knew Snell could not climb the stairs to access legal materials available to the general prison population without a significant risk to his health.  Because all three statutes upon which Snell rests this claim prohibit the same type of discrimination, we can analyze them simultaneously through the rubric of the ADA.  See Nunes, 766 F.3d at 144 (analyzing ADA and

---

[30]  The DOC defendants contradict themselves about whether the district court had jurisdiction to hear Snell's state law claim. At first, their brief states that "[t]he district court had supplemental jurisdiction over plaintiff's [art.] 114 claim as it arose from the same set of facts as plaintiff's federal claims. See[] 28 U.S.C. § 1367."  Then, they argue Massachusetts "G.L. c. 93, § 103, which affords a right of action to adjudicate claims under [art.] 114, vests exclusive jurisdiction in the superior court, and therefore, Snell's claims must be dismissed."  The DOC defendants had it right the first time.

[31]  Although the DOC defendants urge us to affirm summary judgment on Snell's claim pursuant to Massachusetts General Laws ch. 151B, § 1, which protects employees, not inmates, from discrimination, Snell has not raised this statute on appeal, and it is unclear whether his complaint even alleged a violation of that statute.  We therefore need not address it.

Rehabilitation Act claims together); Shedlock v. Dept. of Corr., 818 N.E.2d 1022, 1032 (Mass. 2004) ("The ADA, the [Rehabilitation Act], and art. 114 all prohibit the same conduct: disabled persons may not be excluded from participation in or be denied the benefits of services, programs, or activities, and they may not be subjected to discrimination." (citations omitted)).

Title II of the ADA requires public entities, including prisons and their officials, see Pa. Dept. of Corr. v. Yeskey, 524 U.S. 206, 210 (1998), to provide "meaningful access" to programs, such as law libraries, by taking reasonable steps to overcome barriers, like stairs, which impede access to those programs for inmates with disabilities, Theriault v. Flynn, 162 F.3d 46, 48 (1st Cir. 1998) (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985)); see also Tennessee v. Lane, 541 U.S. 509, 531 (2004) (determining Title II "applies to the class of cases implicating accessibility to judicial services"). As previously detailed, MCI-Concord created a reasonable accommodation by establishing the first-floor Terminal for inmates with documented medical restrictions who could not traverse the stairs to the second-floor law library.[32] The question, then, is whether there is a genuine

---

[32] "The regulations under the relevant portion of the ADA refer to 'reasonable modification,' 28 C.F.R. § 35.130(b)(7), while the coordinating regulations under the Rehabilitation Act use the term 'reasonable accommodation,' 28 C.F.R. § 41.53, but there is no material difference between the terms." Nunes, 766 F.3d at 145 n.6.

issue of material fact that the DOC defendants violated the ADA and its implementing regulations by keeping Snell from using said accommodation.[33] And the answer, once more, turns upon the reasoned medical decisions upon which the DOC defendants relied.

We start by asking whether the record reflects sufficient evidence to create a genuine issue of material fact that: (1) Snell "is a qualified individual with a disability; (2) . . . he was either excluded from participation in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against; and (3) . . . such exclusion, denial of benefits, or discrimination was by reason of [his] disability."[34] Kiman v. N.H. Dept. of Corr., 451 F.3d 274, 283

---

[33] "Because Congress explicitly authorized the Attorney General to promulgate regulations under the ADA, see 42 U.S.C. § 12134(a), the regulations 'must [be given] legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute.'" Parker v. Univ. de P.R., 225 F.3d 1, 5 n.5 (1st Cir. 2000) (alterations in original) (quoting United States v. Morton, 467 U.S. 822, 834 (1984)). Snell makes no claim that the regulations are invalid.

[34] Title II of the ADA states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

The Rehabilitation Act of 1973 similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

(1st Cir. 2006) (internal quotation marks omitted) (quoting <u>Parker</u>

v. <u>Universidad de P.R.</u>, 225 F.3d 1, 5 (1st Cir. 2000)).[35]

---

Art. 114 of the Massachusetts Declaration of Rights declares: "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth."

[35] Courts recognize three types of discrimination prohibited by the ADA: (1) disparate treatment, which arises out of the actor's prejudice; (2) disparate impact, which results from a facially neutral policy that causes a group, such as inmates with disabilities, to lose access to a program or right available to another group without a justifiable excuse for the difference; and (3) denial of a reasonable accommodation the plaintiff needed to meaningfully access a public service. <u>See</u> <u>Nunes</u>, 766 F.3d at 144-45. Unlike the first two categories of discrimination, a plaintiff does not need to demonstrate discriminatory animus for a reasonable accommodation claim, which is the type raised by Snell. <u>See</u> <u>Enica</u>, 544 F.3d at 339.

Snell stresses that we must reverse the grant of summary judgment because the district court mistakenly analyzed his Title II ADA reasonable accommodation claim as one requiring him to show the defendants' decisions "were based on any discriminatory animus." <u>Snell</u>, 2019 WL 4303264, at *7. But Snell mistakes the district court's reasoning, even if the district court could have avoided some confusion by choosing a word other than "animus." The third prong of an ADA Title II reasonable accommodation claim mandates that plaintiffs explain how the decision to deny a reasonable accommodation was discriminatory, even if the actors denying the accommodation did not have any intent to discriminate. <u>See</u> <u>Kiman</u>, 451 F.3d at 285. Without discrimination, there would be no ADA claim. The district court thus commented about animus only so far as to analyze whether the exclusion qualified as discriminatory, using the term when discussing the medical recommendations upon which the prison officials relied and whether the prison officials excluded Snell from accessing legal materials based on his disability. <u>See</u> <u>Snell</u>, 2019 WL 4303264, at *7. The district court did not improperly require Snell to demonstrate that the DOC defendants intended to discriminate against Snell.

Viewing the evidence in the light most favorable to Snell, we assume he is a qualified individual with a disability under the ADA given his various back, knee, and respiratory problems.  See 42 U.S.C. § 12131(2); see also 28 C.F.R. § 35.108(a)(1)(i), (c)(1)(i) (disability means "[a] physical or mental impairment that substantially limits one or more of the major life activities" including "walking").  Further, the DOC defendants revoked Snell's access to the first-floor Terminal in October 2015, which we assume satisfies the second prong, exclusion.

We thus turn to the third prong (whether the DOC defendants excluded Snell on account of his disability).  Unless the evidence shows that the DOC defendants' decisions regarding the reasonable accommodation were "so unreasonable as to demonstrate that they were discriminating against [Snell] because of his disability," we will hesitate to overturn the district court's summary judgment decision.  Kiman, 451 F.3d at 285.

Even examining the evidence in the light most favorable to Snell, the DOC defendants did not "exclude[ Snell] from participation," 28 C.F.R. § 35.149, in the law library "by reason of his disability," 42 U.S.C. § 12132.  In October 2015, Snell did not have a medical restriction justifying his use of the first-floor Terminal.  The DOC defendants admitted they would have allowed Snell to access the Terminal had Dr. Ruze, or any other

medical provider, written Snell a no-stairs restriction. Until November 2018, no doctor ever felt such a restriction was called for, at which point the DOC defendants transferred Snell to an accessible prison. By the Department of Correction's regulations, the DOC defendants generally deferred to medical personnel on medical questions such as whether Snell could (or should) climb stairs, see 103 DOC 408.07, a reasonable decision to which we grant deference, cf. Pollack v. Reg. Sch. Unit 75, 886 F.3d 75, 81 (1st Cir. 2018) (granting deference to federal regulations implementing the ADA); see also Matthews, 613 F. App'x at 170 (prison officials may reasonably rely upon medical personnel when treating inmates).

Even putting aside the reasonable reliance upon medical advice, the record reflects only that the DOC defendants kept Snell away from the first-floor legal resources because they believed he could get to the second-floor library. Snell may have had an indefinite bottom tier restriction, but even prisoners on the bottom tier would navigate stairs from time to time. Snell himself climbed stairs to and from the law library for years, even while he claimed to have the 1998 indefinite bottom tier restriction exempting him from such an arduous feat. Although a layperson could look at Snell and, given his use of a cane, suspect he might have some difficulty traversing stairs, see Shedlock, 818 N.E.2d at 1030-31 (describing cane use as indicative of difficulty with stairs), and even acknowledging that forcing an inmate to

- 56 -

experience pain to access the law library could constitute an ADA violation, see Matthews, 613 F. App'x at 169; Anderson v. Bickell, 754 F. App'x 113, 118 (3d Cir. 2018), it does not necessarily follow that the DOC defendants had to immediately jump to provide Snell with an accommodation to access the first-floor Terminal given the contrary medical evidence suggesting otherwise, see Kiman, 451 F.3d at 285-86 (officials could deny cane to inmate with ALS in certain circumstances); Hockaday v. Colo. Dept. of Corr., 766 F. App'x 572, 575 (10th Cir. 2019) (noting "ADA prohibits discrimination because of disability, not inadequate treatment for disability" (quoting Simmons v. Navajo Cnty., 609 F.3d 1011, 1022 (9th Cir. 2010), overruled on other grounds by Castro v. Cnty. of L.A., 833 F.3d 1060, 1071 (9th Cir. 2016))).

The DOC defendants also had interests in "maintaining security and order" within the institution when they determined whether providing the accommodation to Snell would have been reasonable, and we will defer to such rationales. Pierce v. Cnty. of Orange, 526 F.3d 1190, 1217 (9th Cir. 2008) (quoting Bell v. Wolfish, 441 U.S. 520, 540 n.23 (1979)). For security purposes, the DOC defendants refused accommodations which appeared to preference one inmate over others, such as allowing Snell access to the first-floor Terminal without a no-stairs restriction when all other would-be users would need to prove that they required an accommodation.

In the DOC defendants' reasonable interpretation of Snell's medical needs and the institution's security needs, Snell would not significantly risk his health by climbing stairs despite his injuries and maladies, and the prison would suffer less potential institutional unrest if the DOC defendants required Snell to so navigate. Notwithstanding that Snell paints his arguments as regarding a reasonable accommodation, at heart he challenges the DOC defendants' reasonable reliance on his physicians' "reasoned medical judgment," decisions with which Snell disagreed. Kiman, 451 F.3d at 285 (quoting Lesley v. Hee Man Chie, 250 F.3d 47, 58 (1st Cir. 2001)). As such, Snell's litigious path has taken him astray. We find no error in the district court's rulings.

**Conclusion**

For the foregoing reasons, the district court's grant of summary judgment to the defendants on all counts is **affirmed**. Each party to bear its own costs.